Kevin A. TOLLIVER, Petitioner,

v.

**Michael SHEETS, Warden,
Respondent.**

No. 2:05–cv–1161.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 18, 2008.

---

James R. Foley, Kenneth R. Spiert, Ohio Public Defender Office, Columbus, OH, for Petitioner.

M. Scott Criss, Stuart Alan Cole, Ohio Attorney General, Columbus, OH, for Respondent.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

On November 20, 2007, the Magistrate Judge issued a *Report and Recommendation* recommending that the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be dismissed. Petitioner has filed objections to the Magistrate Judge's *Report and Recommendation*. For the reasons that follow, petitioner's objections are **OVERRULED**. The *Report and Recommendation* is **ADOPTED** and **AFFIRMED**. This action is hereby **DISMISSED**.

Petitioner objects to all of the Magistrate Judge's recommendations. Petitioner again raises all of the same arguments that previously were presented. Petitioner objects to the Magistrate Judge's recommendation of dismissal of claims one and two on the merits. He again asserts that the Ohio Court of Appeals unreasonably applied or contravened *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), and *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in rejecting his claim that his statements were unconstitutionally obtained by police. Petitioner complains that neither the state court of appeals nor the Magistrate Judge properly scrutinized the facts in considering at what point interrogation by police commenced. He contends that *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), is inapplicable to this case because he unequivocally invoked his right to counsel. Petitioner also again asserts that the state appellate court improperly conducted a harmless error review. Upon review of the record and for the reasons discussed by the Magistrate Judge and the Ohio Tenth District Court of Appeals, this Court is not persuaded by petitioner's ar-

guments. Further, this Court likewise concludes that any error in admission of petitioner's statement(s) to police was harmless in view of other evidence establishing his guilt.

Petitioner likewise objects to the Magistrate Judge's recommendation of dismissal of claims three and four on the merits. Petitioner again argues that the prosecutor violated *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), in view of *Wainwright v. Greenfield,* 474 U.S. 284, 295 n. 13, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), by stating, "Does a distraught person say, 'I'm not of psychologically sound mind?'" during closing arguments, and that he was denied the effective assistance of counsel because his attorney did not object to this statement. For reasons already addressed in the Magistrate Judge's *Report and Recommendation,* this Court does not agree.

Petitioner objects to the Magistrate Judge's recommendation of dismissal of claim five on the merits. Petitioner complains that the Ohio Court of Appeals improperly failed to consider the entire record in its dismissal of this claim, and that its decision is objectively unreasonable as well as an unreasonable determination of the facts. *Objections,* at 971. As discussed by the Magistrate Judge, federal habeas corpus review of state evidentiary rulings is extremely limited. *Waters v. Kassulke,* 916 F.2d 329, 335 (6th Cir.1990); *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988); *Carter v. Jago,* 637 F.2d 449, 457 (6th Cir.1980). The record fails to reflect that claim five warrants federal habeas corpus relief.

Petitioner objects to the Magistrate Judge's recommendation of dismissal of claims eight and nine on the merits. He acknowledges that the United States Court of Appeals for the Sixth Circuit has held that a claim of cumulative error will not support habeas corpus relief, *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir.2002) (citation omitted), but contends that the claim is nevertheless viable because the United States Supreme Court has yet to rule on the issue. *Objections,* at 974. Petitioner also contends that the Magistrate Judge accorded the state appellate court's decision undue deference in consideration of claim nine. Neither of the foregoing arguments is persuasive. The Magistrate Judge properly referred to and applied the AEDPA in concluding that none of petitioner's claims warranted relief in these habeas corpus proceedings. *See* 28 U.S.C. § 2254(d), (e); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Petitioner objects to the Magistrate Judge's recommendation of dismissal of claim seven based upon his failure to fairly present the claim to the state courts as a federal constitutional issue. He contends that the Magistrate Judge improperly *sua sponte* raised the issue of his waiver of this claim without providing him notice or an opportunity to respond. Further, petitioner asserts that he did fairly present to the state courts federal constitutional issues of denial of due process, a fair trial, and the effective assistance of counsel due to the trial court's failure to make a timely ruling on his motion to compel disclosure of Claire Schneider's diary. According to petitioner, fair presentment of the foregoing claims is established by the State's reference to federal cases in response to petitioner's appellate brief, and by the Court of Appeals' decision reviewing the claim for harmless error. Petitioner's arguments are not well taken.

 Petitioner's failure to fairly present his federal constitutional claims to the state courts preliminarily involves an issue under the doctrine of exhaustion.

As a necessary component of the exhaustion of state remedies doctrine, a petitioner's claim must be "fairly presented" to the state courts before seeking relief in the federal courts. *Baldwin v. Reese,* 541 U.S. 27, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

*Whiting v. Burt,* 395 F.3d 602, 612 (6th Cir.2005). The exhaustion requirement must be expressly waived by the respondent. 28 U.S.C. § 2254(b)(3). Additionally, exhaustion is properly raised *sua sponte* by the District Court. *See Benoit v. Bock,* 237 F.Supp.2d 804, 807 (E.D. Michigan 2003), citing 28 U.S.C. § 2254(b)(3); *Rockwell v. Yukins,* 217 F.3d 421, 423–24 (6th Cir.2000); *Prather v. Rees,* 822 F.2d 1418, 1422 (6th Cir.1987). Further, a federal district court may in its discretion also *sua sponte* raise the issue of procedural default "generally after affording the petitioner an opportunity to respond." *Foti v. Bobby,* 2007 WL 1577785 (N.D.Ohio May 31, 2007), citing *Howard v. Bouchard,* 405 F.3d 459, 476 (6th Cir.2005); *Lorraine v. Coyle,* 291 F.3d 416, 426 (6th Cir.2002). Here, petitioner has been given the opportunity to respond to the Magistrate Judge's recommendation of dismissal of claim seven in these objections to the *Report and Recommendation.*

Moreover, as discussed by the Magistrate Judge, petitioner did not refer to the United States Constitution, or a single federal case or state case relying on federal law in making his arguments to the state appellate court. Contrary to his allegation here, the record indicates that the state courts likewise reviewed his claim only for a violation of state law. Petitioner cannot claim that he fairly presented his claim to the state courts by the reference to due process and citations made in the prosecutor's responsive brief.

Finally, petitioner objects to the Magistrate Judge's recommendation of dismissal of claims five, six, ten, and eleven as procedurally defaulted. He again raises all of the same arguments in regard to these procedural defaults that he previously raised. For all the reasons discussed in detail in the Magistrate Judge's *Report and Recommendation,* these objections likewise are not well taken.

Pursuant to 28 U.S.C. § 636(b)(1), this Court has conducted a *de novo* review of the *Report and Recommendation.* This Court has carefully considered the entire record, all of the cases referred to by petitioner, as well as all of the arguments presented herein. For all the foregoing reasons, and for the reasons discussed in the Magistrate Judge's *Report and Recommendation,* petitioner's objections are **OVERRULED.** The record fails to indicate that petitioner is entitled to federal habeas corpus relief. The *Report and Recommendation* is **ADOPTED** and **AFFIRMED** and this action is hereby **DISMISSED.**

The Clerk shall enter **FINAL JUDGMENT** in this action.

**IT IS SO ORDERED.**

### *ORDER and REPORT AND RECOMMENDATION*

NORAH McCANN KING, United States Magistrate Judge.

Petitioner, a state prisoner, brings this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the amended petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties.

For the reasons that follow, petitioner's motion for an order directing respondent to supplement and expand the record, Doc. No. 35, is **DENIED;** the Magistrate Judge

**RECOMMENDS** that this action be **DISMISSED**.

### REQUEST TO SUPPLEMENT AND EXPAND THE RECORD

 Petitioner requests the Court to direct respondent to supplement the record with the supplemental transcripts filed in the Ohio Court of Appeals on March 25, 2003, and April 3, 2003, in connection with habeas corpus claims one and two, in which petitioner asserts that he was denied a fair trial because his statements to police were improperly submitted to the jury. Both of these transcripts have already been made a part of the record before this Court. *See Transcripts, manually filed,* Doc. No. 9. Petitioner's request for supplementation of the record with the transcripts is therefore **DENIED** as moot.

Petitioner also requests expansion of the record to include a copy of Claire Schneider's journal or diary (Court's Exhibit 1); video recordings belonging to petitioner and Claire Schneider that were removed from the apartment by Claire's family (Court's Exhibits 2 and 3); and the videotape of petitioner's statement to police (Joint Exhibit 1). *Motion to Expand Record,* at 3. Petitioner states that Claire Schneider's diary is material to this Court's consideration of habeas corpus claim seven, in which he asserts that he was denied due process, a fair trial and the right to the effective assistance of counsel because the trial court failed to issue a timely ruling on his motion to compel disclosure of the diary. However, for the reasons that follow, the Magistrate Judge concludes that petitioner failed to fairly present the federal constitutional issue(s) raised in claim seven to the state courts, and recommends dismissal of the claim on that basis. Therefore, review of the diary is not required. Petitioner contends that review of the video recordings are material

to this Court's consideration of habeas corpus claim eleven, in which he asserts the ineffective assistance of appellate counsel. However, for the reasons that follow, the Magistrate Judge concludes that claim eleven is procedurally defaulted. Therefore, review of the video recordings is likewise not required. Finally, petitioner states that review of the videotape of his statement to police is needed for resolution of habeas corpus claims one and two, in which he asserts that his statement was unconstitutionally obtained by police and submitted as evidence against him at trial. However, the transcripts of those videotaped statements are already a part of the record before this Court. Petitioner does not identify, and this Court is unable to discern from the record, any additional support that the videotape of his statement would provide for his claims that the transcripts of the police interview do not. Therefore, petitioner's request for expansion of the record is **DENIED**.

### I. FACTS AND PROCEDURAL HISTORY

The facts and procedural history are detailed in this Court's *Report and Recommendation,* July 19, 2007, Doc. No. 29, but will be repeated here. The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On January 9, 2002, defendant was indicted by a Franklin County Grand Jury on one count of murder with a firearm specification, in violation of R.C. 2903.02 and 2941.145, respectively, and one count of tampering with evidence in violation of R.C. 2921.12. Prior to trial, defendant's motion to suppress statements made by defendant was denied. A jury trial commenced on June 3, 2002. Following opening statements, the court, on motion of defendant, dismissed the

tampering with evidence count. The court's oral decision was reaffirmed in a subsequently filed written decision. After a three-week trial, the jury returned a verdict finding defendant guilty of murder with a firearm specification. The trial court sentenced defendant to 15 years to life on the murder charge, with an additional three years incarceration on the firearm specification. Thereafter, defendant filed a motion for judgment of acquittal or, in the alternative, motion for new trial, to which the state responded. By decision and entry filed August 13, 2002, the trial court denied defendant's motion without a hearing. Claire Schneider began dating defendant in the fall of 1999. Defendant was divorced from his ex-wife, Natasha Tolliver, with whom he shared custody of their young daughter. Claire, a student at The Ohio State University ("OSU") and a part-time nail technician, moved into Apartment 120 in the Olentangy Village Apartment complex located at 100 North Street, Columbus, Ohio, in January 2001. Defendant began living with Claire in September 2001. Claire and defendant planned to move out of the apartment and into a house, once defendant's extensive remodeling of the house was completed in January 2002. Claire obtained a loan to purchase the house.

Claire had been accepted into OSU's Program in International Development and was scheduled to study in the Dominican Republic from January 5, 2002 to February 16, 2002. Defendant was scheduled to meet Claire in the Dominican Republic at the conclusion of the program and spend a week vacationing with her. Claire told both her father, Walter Schneider, and her friend and co-worker, Gail Isenberg Hayes, that she was excited about the upcoming trip. She never mentioned to either of them that she had any plans to marry defendant.

In August 2001, Claire went to Dr. Stanley McCloy complaining of sleeping difficulty, nightmares, panic attacks and an inability to concentrate. Dr. McCloy diagnosed moderate depression and prescribed Paxil. Pharmacy records indicated that Claire's Paxil prescription was last filled on November 24, 2001.

On December 28, 2001, Claire attended the closing on the house. Problems arose with some of the documentation, so the transaction was not completed.

Around 12:00 a.m. on December 29, 2001, Claire and defendant had drinks at a restaurant with a friend and later went to a nearby nightclub. At one point, Claire's co-worker, Abby Warner, noticed Claire and defendant dancing together; however, Warner later saw Claire dancing without defendant. Warner noticed that defendant was watching Claire as if he were angry.

Collin Bumgarner, the manager of the nightclub, saw defendant and Claire leave the nightclub and walk to defendant's vehicle. The couple attracted Bumgarner's attention because they were speaking loudly to one another; however, Bumgarner did not view the incident as alarming.

Defendant and Claire returned to the apartment at approximately 12:36 a.m. Approximately five minutes later, defendant, wearing a light-colored shirt, exited the apartment building and searched the parking lot with a flashlight. He returned to the building approximately four minutes later.

At 1:15 a.m., Janet Parady, who resided in Apartment 220, was awakened to a man screaming "No, No. Don't, don't. Oh, please. Please." (Vol. I, Tr. 76.) She called 911 and reported that she

thought the screaming came from Apartment 320, the apartment directly above her. She further reported that the people who lived in apartment 320 had been fighting for approximately one-half hour, and that it sounded like someone had fallen down.

Columbus Police Officer David Shots responded to Parady's 911 call at 1:18 a.m. While he was in Parady's apartment, he heard a noise that sounded like "moaning or crying." (Vol. I, Tr. 139.) He could not determine what the sound was or where it originated, so he conducted no further investigation. Because Parady reported that the earlier disturbance came from Apartment 320, Shots proceeded there. In response to questioning by Shots, the occupants denied that any arguing or fighting had occurred. At approximately 1:45 a.m., Natasha Tolliver received a telephone call from defendant. Defendant was sobbing and told Natasha that if she ever loved him, she would come to his apartment immediately. Natasha put her daughter in her car and drove to the apartment complex at approximately 1:55 a.m. When she arrived at defendant's apartment, she saw blood smeared on the front door. Defendant was dressed in a blood-stained bathrobe and had blood on his hands and legs. She also noticed blood on the living room wall and kitchen floor. Natasha told defendant she was going to take their daughter back to the car. Defendant followed her outside. When she asked defendant what had happened, he told her that he was "really in trouble." (Vol. XII, Tr. 1727.) Natasha told defendant to call the police. Defendant was crying so hysterically that Natasha thought he was having a breakdown. Defendant said he was going to kill himself and that he wanted to see his daughter. Natasha called 911 and reported what had happened. She then drove to the other side of the parking lot because she was afraid defendant might kill himself in front of their daughter.

Peter Kovarik, the resident of Apartment 215, returned to the apartment complex at approximately 2:00 a.m. As he walked inside the building, he noticed defendant, dressed in a bathrobe, standing in the hallway outside Apartment 117. Defendant seemed startled to see Kovarik and ducked into the alcove outside Apartment 117. Seconds later, defendant stepped out from the alcove and asked Kovarik "how's it going?" (Vol. I, Tr. 107.) In response, Kovarik asked defendant "how is it going with you?" Defendant responded "good." (Vol. I, Tr. 108.) According to Kovarik, defendant did not act as if he were upset about anything and did not ask him for assistance.

Officers Shots and Paul Coulter responded to Natasha's 911 call between 2:00 and 2:05 a.m. Natasha met the officers outside the building and reiterated what she had reported in her 911 call. Thereafter, the officers proceeded to defendant's apartment. Defendant emerged from the apartment, dressed only in a bathrobe. The bathrobe had blood on it, as did defendant's feet and legs. Defendant was talking on a cell phone (later determined to be Claire's) and holding a bloody dishtowel. Defendant told the officers, "[s]he shot herself." (Vol. I, Tr. 149.) According to both Shots and Coulter, the door to Apartment 117 had smeared blood on it, as if someone had tried to wipe blood off the door. There was also blood spatter on the door jamb of Apartment 117. Defendant was immediately handcuffed and placed in Shots' cruiser. Defendant said, "I can't believe she did this. She has only held a gun-she has never even

held a gun." (Vol. I, Tr. 152.) Defendant then started to cry and said "her dad is going to be mad at me." *Id.* Defendant also averred that he could not find a telephone. Defendant ultimately fell asleep in the cruiser and was thereafter transported to the police station. While searching the apartment, Officer Coulter found blood on the walls and floor, as well as on several items in the apartment. An overturned floor lamp and potted plant lay on the living room floor. Coulter discovered Claire's dead body lying face-up on the bathroom floor on top of a black nylon jacket. Her arms were partially inside the sleeves of the jacket, which was saturated with blood. A blood-covered 9mm Ruger semiautomatic pistol, an envelope containing $3, and a handwritten note were found on the vanity in the bathroom. The note said "she did not know gun was loaded. I loved her. Could not find the phone." (Vol. II, Tr. 308, State's Exhibits D120, D121, E12.) Inside the sink lay two live shells and the gun's magazine clip containing 12 live shells. The gun did not contain a live round in the chamber. The bathroom door contained a single bullet hole that had several strands of hair attached to it. A spent 9mm shell casing was found in the hallway just outside the bathroom. A spent 9mm bullet was found behind the door in the bathroom. Two pens and a semiautomatic weapon magazine clip containing live rounds of ammunition were found underneath Claire's body. Columbus Police Detective Robert Viduya arrived at the scene after defendant was secured in the cruiser. Viduya instructed the transport officers not to allow defendant to go to the bathroom at the police station, so that blood evidence on defendant's body could be collected. Photographs taken of defendant at the police station show blood on defendant's face, legs and feet; however, no blood appears on defendant's hands.

A videotaped interview of defendant was conducted at the police station. The substance of the interview will be discussed below.

Columbus Police Crime Scene Search Unit Detectives Thomas Seevers and Mark Henson processed the scene on December 29, 30 and 31, 2001. Over the course of three days, 181 photographs were taken and 23 bags of evidence were collected. Seevers noted that that there was no land line telephone in the apartment. No fingerprint lifts were taken from the bullets found in the bathroom, nor was the gun checked for latent fingerprints. No gunshot residue analysis was performed on Claire because gunshot victims are assumed to have residue on them. No gunshot residue analysis was performed on defendant due to defendant's close proximity to Claire at the time of the shooting and because defendant said he had washed his hands. Two cell phones were recovered from defendant's vehicle, which was in the parking lot adjacent to the building. Claire's wallet was recovered from the parking lot.

After the police completed processing the scene, the locks on the apartment were changed. The only persons with keys to the apartment were apartment manager Molly Bringarner and maintenance supervisor Kenneth Smith. On January 7, 2002, two employees of Servpro, a biohazard cleanup company, were permitted entrance to clean the apartment of blood residue. An insurance claims representative was also permitted access to the apartment on January 7, 2002 to assess damage.

On January 9, 2002, Claire's stepmother, Amy Schneider, and Claire's aunt, Teresa Reid, went to the apartment to sort

and pack items in preparation for removing them. While sorting through clothes in the master bedroom, Reid discovered a pair of men's black slacks with blood on the inside of one of the pockets lying on the floor, and a man's white dress shirt with blood on it near the bottom of a clothes hamper, underneath some other clothes. Because she assumed the police had retrieved everything they needed from the apartment, Reid placed the items in two separate garbage bags and left them in the apartment. Later that day, Reid informed Claire's father, Walter Schneider, of her discovery. After conferring with the police and one of the prosecutors, Mr. Schneider contacted Reid and asked her to meet him at the apartment the next day. Mr. Schneider retrieved the items from Reid when the two met at the apartment on January 10, 2002. While in the apartment, Mr. Schneider noticed blood on a pair of defendant's black boots; however, he did not retrieve the boots at that time. Mr. Schneider put the slacks and shirt in the back of his vehicle. On January 13, 2002, Mr. Schneider asked his son-in-law to retrieve the boots from the apartment. After the son-in-law retrieved the boots, Mr. Schneider stored the slacks, shirt and boots in the basement of his home. Later that evening, Mr. Schneider contacted the police. Detective Michael Cone retrieved the items from Mr. Schneider's residence and submitted them to the Columbus Police Department ("CPD") property room.

Keith Norton, forensic pathologist and deputy coroner at the Franklin County Coroner's office, performed an autopsy on Claire. During the autopsy, Norton discovered several contusions on Claire's legs and several small abrasions on the right side of her face near her mouth. He also discovered an abrasion and a contusion on the left side of Claire's neck which he estimated to be less than 48–hours old. He further discovered that the right side of Claire's lips were severely burned. There was no damage to Claire's front teeth, but several of the back teeth on the upper right side of Claire's mouth had been fractured. Based on the damage to Claire's teeth and lips, Norton determined that the bullet entered the corner of the right side of Claire's mouth, and that her mouth was open when the bullet entered. Norton could not visualize the entrance wound in the back of the mouth because it was so far back; however, he could see the exit wound in the back of the neck. Norton determined that the trajectory of the bullet was front to back, slightly left to right, and upward.

A toxicology screen of Claire's blood measured 0.16 grams of alcohol; no other drugs were found. Norton concluded that the cause of death was a loose contact wound to the head; however, he could not determine the manner of death, as it was unclear whether it was suicide or homicide. Norton found it unlikely that Claire's death was an accident due to the proximity of the gun to her mouth at the time the gun was discharged. According to Norton, it would have been an unusual form of suicide to have fired a weapon from outside the mouth into the mouth. He conceded, however, that Claire, who was left-handed, could have caused the wound if she held the gun in her left hand. He estimated that after sustaining the gunshot wound, Claire would have become unconscious within seconds and would have died within 30 minutes. He also reported that the autopsy findings were not inconsistent with cardiop-

ulmonary resuscitation ("CPR") having been performed.

Columbus Police Criminalist Amoreena Clarkson performed a blood analysis of several items of evidence. Claire's blood was confirmed to be present on a dishtowel, gloves, paper towel, defendant's bathrobe, defendant's body, the magazine clip, white shirt, black slacks and black boots.

Columbus Police Detective and blood-stain expert Robert Young viewed the crime scene on December 30, 2001. He also reviewed photographs of the crime scene, laboratory reports, police reports, and defendant's statement. Young noted diluted blood droplets in the kitchen, which indicated that some cleanup effort had occurred. He also identified several blood transfer stains on Claire's body which Young opined were made by the repositioning of her body after her death. Young determined that Claire had been shot while standing in the bathroom and that the bullet passed through the bathroom door approximately 62 inches from the floor. He further determined that because the pen used to write the note discovered on the sink was found under Claire's body, defendant repositioned Claire's body on top of the pen after she was shot.

Young also noted 18 impact spatterings on the right forearm of the white shirt found in the clothes hamper. According to Young, the entrance wound in Claire's mouth produced high velocity back spatter, which landed on the right sleeve of the shirt, demonstrating that the shirt was in close proximity to Claire's face at the instant she was shot. Impact droplets in the button line on the front of the shirt indicated that the shirt was worn unbuttoned at the time of the spattering. Young candidly admitted that he did not think the shooting was a homicide until he saw photographs of the shirt. Young conceded that expirated blood from Claire's mouth or nose expelled during CPR might appear as high velocity spatter, but he did not believe that the bloodstains on the shirt were expirated. Young concurred in Norton's opinion that the fact that only Claire's back teeth sustained damage indicated that her mouth was open at the time she was shot. Young agreed that the blood spatterings found on the shirt are consistent with the theory that someone fired the gun with the left hand while holding Claire by the throat with the right hand. Young conceded, however, that the blood spatter evidence did not provide a direct indication of who fired the gun.

Columbus Police Criminalist and ballistics expert Mark Hardy examined both the shell casing and spent bullet found in the bathroom and determined that the bullet had been fired from the 9mm weapon found at the scene. Hardy further determined that the gun was capable of being fired without the magazine clip being inserted.

Hardy further determined that the gun was fired so close to Claire's mouth that the gasses projected out of the muzzle burned Claire's lips. Using a transparent overlay that showed the forward face of the gun, and placing that overlay over a photograph of the burned area on the right side of Claire's mouth, Hardy determined the orientation of the gun when it was fired. An unburned area on the right corner of Claire's mouth showed that the gun had been in contact with her mouth and that the recoil guide of the weapon had protected the corner of her mouth from the hot outgassing that otherwise burned her lips. Hardy determined that the gun was positioned on its side with the butt of the gun facing to the left; in other words, the gun was turned 90 degrees clockwise.

Defense bloodstain expert Stuart James determined that Claire was standing no more than 6 to 12 inches from the bathroom door when she was shot. With regard to the bloodstain spatters on the white shirt, James concluded that it was impossible to state with scientific certainty whether the spatters were produced by gunshot back spatter.

Claire's cell phone records demonstrate that between 1:29 and 2:15 a.m. on December 29, 2001, seven calls were made to Natasha Tolliver's cell phone, one call was made to Claire's cell phone, one call was made to defendant's cell phone, and one call was made to a friend of defendant.

While defendant was awaiting trial, he was confined with an inmate named Joseph Adams. After Adams discovered that defendant had been charged with murder, he decided to try to coerce defendant into revealing details about the murder so that he could then provide that information to the state in exchange for a reduction in his sentence. After Adams provided the information obtained from defendant, the state agreed to an eight-year reduction in Adams' 16–year sentence in exchange for his testimony. Adams testified that he obtained all the details about the murder from defendant and did not get any details from the prosecutor, the police, or television news.

According to Adams, defendant told him that Claire worked as a nail technician and that she was going to study in the Dominican Republic. Defendant said he did not want Claire to go to the Dominican Republic because he might lose her. He also told Adams that they were preparing to move into a house and that they were planning to get married in the Dominican Republic.

Adams testified that defendant initially told him that Claire was depressed and committed suicide by shooting herself in the chest. He later admitted that a discussion about her finalizing plans for her trip led him to kill her with a 9mm weapon. Defendant initially said that he did not call 911 immediately because he was in shock. However, he later confessed that he did not call 911 because he had to get rid of evidence, move the body to make it look like Claire killed herself, and get blood on himself to make it look like he had held her. Defendant also told Adams that his defense would be that Claire killed herself and he would look remorseful and cry in front of the jury so they would believe him.

An inmate incarcerated with defendant and Adams, David Dye, testified on behalf of defendant. According to Dye, Adams approached him prior to defendant's trial and asked him if he wanted to testify against defendant in order to "help myself (Dye) out." (Vol. XII, Tr. 1670.) Dye told Adams that he could not testify against defendant because he did not know anything about defendant's case. He further stated that although Adams never told him he had made up the story about defendant, Dye got the impression that Adams had done so.

*State v. Tolliver,* 2004 WL 625683 (Ohio App. 10 Dist. March 30, 2004), Exhibit F to Return of Writ. Represented by the same counsel,[1] petitioner filed a timely appeal. He raised the following assignments of error:

[I.] THE TRIAL COURT ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENTS DURING HIS

---

1. Three attorneys represented petitioner at trial. One of those attorneys, Carol Wright, also represented him on appeal. *See* Exhibits B and C to Return of Writ.

CUSTODIAL INTERROGATION WHERE THE STATEMENTS WERE TAKEN IN VIOLATION OF *MIRANDA v. ARIZONA* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

[II.] THE CONVICTION OF THE DEFENDANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS THERE WAS INSUFFICIENT EVIDENCE OF A PURPOSEFUL KILLING.

[III.] DEFENDANT'S FIFTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE PROSECUTION ARGUED THAT DEFENDANT'S INVOCATION OF HIS RIGHT TO SILENCE INDICATED THAT HE WAS GUILTY. THIS VIOLATED DEFENDANT'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS UNDER THE U.S. CONSTITUTION AND ARTICLE 2, § 2, 10 AND 16 OF THE OHIO CONSTITUTION.

[IV.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY ALLOWING ADMISSION OF THE WHITE SHIRT WHEN THERE WAS AN INSUFFICIENT CHAIN OF CUSTODY AND THE SHIRT WAS MORE PREJUDICIAL THAN PROBATIVE THEREBY DENYING DEFENDANT HIS RIGHTS TO DUE PROCESS, AND A FAIR TRIAL UNDER THE STATE AND FEDERAL CONSTITUTIONS.

[V.] A DEFENDANT IS DENIED HIS RIGHTS TO A FAIR TRIAL, DUE PROCESS AND A RELIABLE DETERMINATION OF HIS GUILT AND SENTENCE AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION WHEN THE PROSECUTOR REPEATEDLY ENGAGES IN IMPROPER ARGUMENT AND OTHER MISCONDUCT.

[VI.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN REFUSING THE DEFENSE ACCESS TO CLAIRE SCHNEIDER'S DIARY, COURT EXHIBIT 1, PARTICULARLY AFTER THE PROSECUTOR PRESENTED EVIDENCE IN DIRECT CONTRAST TO ENTRIES IN THE DIARY.

[VII.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO GRANT AN EVIDENTIARY HEARING ON THE MOTION FOR NEW TRIAL.

[VIII]. A CONVICTION MUST BE REVERSED WHEN THE CUMULATIVE EFFECT OF ERRORS DEPRIVES A DEFENDANT OF HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

*Id.* On March 30, 2004, the appellate court affirmed the trial court's judgment. *Id.* Still represented by counsel, petitioner filed a timely appeal to the Ohio Supreme Court. He raised the following propositions of law:

1. A defendant's statements in response to express questioning during custodial interrogation must be suppressed when there are no *Miranda* warnings and no voluntary, knowing and intelligent waiver of the right against self-incrimination as they violate the Fifth and Fourteenth Amendments to the United States Constitution.

2. The use of statements made by a defendant after his request for an attorney violates the Fifth and Fourteenth Amendments to the United States Constitution.

3. Defendant's Fifth Amendment rights were violated when the prosecu-

tion argued that defendant's invocation of his right to silence indicated that he was guilty. This violated defendant's rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments under the U.S. Constitution and Article 2, § 2, 10 and 16 of the Ohio Constitution. *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91.

4. Counsel's failure to object to the *Doyle v. Ohio* error was ineffective assistance of counsel and violated appellant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

5. Admission of evidence when there is an insufficient chain of custody and the evidence is more prejudicial than probative denies a defendant his rights to due process, and a fair trial under the state and federal constitutions.

6. A defendant is denied his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the prosecutor repeatedly engages in improper argument and other misconduct.

7. A court denies due process, a fair trial and the effective assistance of counsel as guaranteed by the U.S. Constitution when it withholds material information and documents available to the prosecution from the defense.

8. A conviction must be reversed when the cumulative effect of errors deprives a defendant of his state and federal constitutional right to a fair trial.

Exhibit G to Return of Writ. On August 4, 2004, the Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal. Exhibit I to Return of Writ. Petitioner filed a motion for reconsideration. On September 29, 2004, the Ohio Supreme Court denied the motion. Exhibits J and K to Return of Writ.

Meanwhile, on June 9, 2003, petitioner filed a *pro se* petition for post conviction relief with the state trial court. He asserted the following claims:

1. Counsels' ineffectiveness in failing to introduce evidence of "Paxil withdrawal syndrome" to show the victim Claire Schneider committed suicide.

2. Ineffectiveness in failing to have the white shirt tested for gun shot residue.

3. Ineffectiveness in failing to have the brown coat tested for gun residue.

4. Ineffectiveness in failing to elicit evidence from Claire's family members regarding Claire's emotional state.

5. Actual innocence.

*See* Exhibits L and N to Return of Writ. On May 7, 2004, the trial court denied the petition. Exhibit N to Return of Writ. Petitioner filed a timely appeal. He asserted the following claims:

I. THE TRIAL COURT ERRED IN NOT HOLDING AN EVIDENTIARY HEARING PURSUANT TO R.C. 2953.21(E); AND 2953.22.

II. THE TRIAL COURT ERRED IN FINDING THE CLAIMS OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL WAS BARRED BY DOCTRINE OF RES JUDICATA. [sic] WHEN SUCH EVIDENCE THAT COUNSEL FAILED TO INVESTIGATE DEHOURED [sic] THE TRIAL RECORD IN ITS ENTIRETY.

*See State v. Tolliver*, 2005 WL 534897 (Ohio App. 10 Dist. March 8, 2005), Exhibit R to Return of Writ. On March 8, 2005, the appellate court affirmed the trial court's dismissal. Petitioner filed a timely appeal to the Ohio Supreme Court in which he raised the following propositions of law:

1. The trial court erred in not holding an evidentiary hearing pursuant to R.C. 2953.21(E).

2. The trial court erred in finding the claim of ineffective assistance of trial counsel's failure to investigate pre-trial to be barred by *res judicata*.

Exhibit S to Return of Writ. On August 10, 2005, the Ohio Supreme Court declined jurisdiction to hear the case and dismissed the appeal as not involving any substantial constitutional question. Exhibit U to Return of Writ

Additionally, on December 29, 2004, petitioner filed a delayed application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). Exhibit V to Return of Writ. On May 5, 2005, the appellate court denied petitioner's delayed application as untimely. Exhibit Y to Return of Writ. Petitioner filed a motion for reconsideration, which motion was denied. Exhibits Z and BB to Return of Writ. Petitioner filed a timely appeal to the Ohio Supreme Court; however, on August 10, 2005, the Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. Exhibits CC and EE to Return of Writ.

Represented by the Ohio Public Defender, on December 28, 2005, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

1. Mr. Tolliver's rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to suppress, and the State presented to the jury, Mr. Tolliver's statements made in response to express questioning that occurred during custodial interrogation conducted without the benefit of *Miranda* warnings and in the absence of a voluntary, knowing and intelligent waiver of Mr. Tolliver's right against self-incrimination.

2. Mr. Tolliver's rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated when the trial court failed to suppress, and the State presented to the jury, statements Mr. Tolliver made after his request for an attorney.

3. Mr. Tolliver's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated when the prosecution argued that Mr. Tolliver's invocation of his right to remain silent indicated that he was guilty.

4. Mr. Tolliver's right to the effective assistance of trial counsel was violated when counsel failed to lodge a contemporaneous objection to the State's use of Mr. Tolliver's invocation of his right to remain silent to infer his guilt.

5. Mr. Tolliver was denied his federal constitutional rights to due process and a fair trial when the trial court allowed the admission of physical evidence that was the product of a highly unreliable chain of custody and unduly prejudicial to Mr. Tolliver.

6. Mr. Tolliver was denied his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when the prosecutor repeatedly engaged in improper argument and other misconduct.

7. Mr. Tolliver's rights to due process, a fair trial, and the effective assistance of counsel were denied by the trial court's withholding from the defense material information and documents that were available to the prosecution.

8. The cumulative effect of trial error violated Mr. Tolliver's rights due process and a fair trial.

9. Mr. Tolliver's trial counsel were constitutionally ineffective in failing to pro-

cure and present additional evidence and argument concerning Paxil, Paxil Withdrawal Syndrome, Claire Schneider's medical and psychological history, and the relationship of these matters to Claire Schneider's death.

10. Mr. Tolliver's trial counsel were constitutionally ineffective in failing to have the white shirt and the brown coat tested for gunshot residue.

11. Mr. Tolliver's appellate counsel provided constitutionally ineffective assistance in failing to raise two assignments of error:

1. Counsel provided constitutionally deficient performance and was ineffective in failing to identify the state's witness Joseph Adams as an agent of the state and attacking his questioning of the defendant as reinterrogation or secret interrogation. . . .

2. Counsel provided constitutionally deficient performance and was ineffective in failing to recognize the defendant was not present at a critical stage of the trial proceedings. . . .

On November 6, 2006, petitioner filed a motion to amend the petition to include an unexhausted claim that he was denied the right to present a defense. Doc. No. 19. The Court granted petitioner's request, but denied his request for a stay pending exhaustion as improper under *Rhines . v. Weber*, 544 U.S. 269, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). Doc. No. 29. On August 28, 2007, the Court granted petitioner's subsequent request to delete his unexhausted claim and proceed on the remaining exhausted claims in lieu of dismissal of the petition as unexhausted. Doc. Nos. 32–33.

It is the position of the respondent that claims four through six, ten and eleven are procedurally defaulted, and that the remainder of petitioner's claims are without merit.

## II. PROCEDURAL DEFAULT

■ In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (*per curiam* ); *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the Court must determine whether the state courts actual-

ly enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the Court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This "cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir. 1985).

In claim four, petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to object to comments by the prosecutor during closing argument, allegedly in violation of *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). According to respondent, this claim has been waived because petitioner failed to assert the claim on direct appeal; however, the record indicates that, although petitioner did not present the claim as an assignment of error on appeal, he did argue in his appellate brief (in support of his claim that he was denied a fair trial by the prosecutor's *Doyle* violation) that, should the appellate court conclude the claim had been waived due to his failure to object at trial or fail to find plain error, he also asserted the ineffective assistance of counsel for failing to object to the error. *See Appellate Brief, Exhibit C to Return of Writ,* at 37. Thereafter, petitioner asserted the ineffective assistance of counsel due to his attorney's failure to object to the prosecutor's comment in proposition of law IV before the Ohio Supreme Court. *See Exhibit G to Return of Writ.* Thus, he appears to

have preserved claim four for federal habeas corpus review. In any event, however, and for reasons discussed *infra,* the claim is without merit.

In claim five, petitioner asserts that he was denied a fair trial by admission of physical evidence, *i.e.,* a white shirt, that was the product of a "highly unreliable chain of custody" and unduly prejudicial. *Petition,* at 5. Respondent contends that petitioner has waived this claim by failing to object to admission of the shirt on that basis at trial. The state appellate court therefore reviewed the claim for plain error only:

> [D]efendant contends that the trial court abused its discretion in admitting the white shirt into evidence without the state having maintained a proper chain of custody. Defendant also maintains that the probative value of the shirt was substantially outweighed by the danger of unfair prejudice, resulting in the denial of a fair trial to defendant.
>
> * * *
>
> Defendant ... contends, pursuant to Evid.R. 403(A), that the trial court erred in admitting the shirt because its probative value was substantially outweighed by the danger of unfair prejudice.
>
> Evid.R. 403(A) provides that, "[a]lthough relevant, evidence is not admissible if the probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."
>
> Initially, we note that defendant's trial counsel objected to the admission of the shirt only on the ground that the chain of custody was not properly established. Therefore, a reversal on the ground that the shirt was inadmissible under Evid.R. 403(A) is proper only if it was plain error. Plain error is an obvious error that affects a substantial right. It does

not exist unless it can be said that, but for the error, the outcome of the trial court clearly would have been otherwise. *State v. Yarbrough,* 95 Ohio St.3d 227, 767 N.E.2d 216, 2002–Ohio–2126, at ¶ 139.

Based upon a review of the entire record, we cannot say the result of the trial would clearly have been different without the admission of the shirt. As we have previously noted, other evidence supports defendant's conviction. The fourth assignment of error is not well taken, and is overruled.

*State v. Tolliver,* 2004 WL 625683 (Ohio App. 10th District March 30, 2004), *Exhibit F* to Return of Writ.

Petitioner, however, contends that his claim that admission of the white shirt was unduly prejudicial may properly be considered in these habeas corpus proceedings because the state court's plain error review was not independent of federal law and fails the third part of the *Maupin* test.

■ This Court is not persuaded by petitioner's argument. The United States Court of Appeals for the Sixth Circuit has held that plain error review does not constitute a waiver of the state's procedural default rules. *Seymour v. Walker,* 224 F.3d 542, 557 (6th Cir.2000). As explained by the United States District Court for the Northern District of Ohio in *Adams v. Bradshaw,* 484 F.Supp.2d 753, 771 (N.D.Ohio 2007):

Ohio has a contemporaneous objection rule under which an appellant who fails to object waives later review of the issue unless plain error can be shown. *Williams v. Bagley,* 380 F.3d 932, 968 (6th Cir.2004), *cert. denied,* 544 U.S. 1003, 125 S.Ct. 1939, 161 L.Ed.2d 779 (2005) (citing *State v. Smith,* 89 Ohio St.3d 323, 332, 731 N.E.2d 645 (2000)). The Sixth Circuit has held that Ohio's contemporaneous objection rule consti-

tutes an adequate and independent state ground barring federal review absent a showing of cause for the waiver and resulting prejudice. *Id.; Hinkle v. Randle,* 271 F.3d 239, 244 (6th Cir.2001); *Stojetz v. Ishee,* 2006 WL 328155 *12 (S.D.Ohio Feb.10, 2006).

A state court's review of an issue for plain error is considered by the Sixth Circuit as the enforcement of a procedural default. *Williams,* 380 F.3d at 968; *Hinkle,* 271 F.3d at 244. The federal court, in determining whether a state court has relied on a procedural rule to bar review of an issue, examines the latest reasoned opinion of the state courts and presumes that later courts enforced the bar instead of rejecting the claim on the merits. *Hinkle,* 271 F.3d at 244 (citing *Ylst, v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)).

*Id.* This Court therefore likewise concludes that petitioner has waived the right to present claim five in these habeas corpus proceedings.

In claim six, petitioner asserts that he was denied a fair trial due to prosecutorial misconduct. Again, petitioner properly raised this claim on direct appeal; however, Ohio's Tenth District Court of Appeals reviewed the claim only for plain error due to petitioner's failure to object at trial:

Defendant's claims of prosecutorial misconduct pertain to the prosecutor's closing arguments. We note initially that defendant failed to object to any of the challenged statements; accordingly, defendant has waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916.

*State v. Tolliver, supra; Exhibit F* to Return of Writ.

Still, petitioner contends that claim six is properly considered in these habeas cor-

pus proceedings because the Court of Appeals went on to address the merits of his claim of prosecutorial misconduct and did not clearly and expressly enforce any procedural bar, thus failing the second part of *Maupin.* *Traverse*, at 30–31.[2] This Court is not persuaded by petitioner's argument.

2. The state appellate court went on to reject the merits of petitioner's claim of prosecutorial misconduct as follows:

> Prosecutors are afforded wide latitude in closing arguments. *State v. Jacks* (1989), 63 Ohio App.3d 200, 210, 578 N.E.2d 512. The arguments must be reviewed in their entirely to determine whether the prosecutor's disputed remarks were prejudicial. *State v. Mann* (1993), 93 Ohio App.3d 301, 312, 638 N.E.2d 585. For a prosecutor's closing argument to be prejudicial, the remarks must be "so inflammatory as to render the jury's decision a product solely of passion and prejudice." *State v. Williams* (1986), 23 Ohio St.3d 16, 20, 490 N.E.2d 906. Even if a prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial. *State v. Tumbleson* (1995), 105 Ohio App.3d 693, 699, 664 N.E.2d 1318.

> Defendant first contends that the prosecutor went beyond the evidence in arguing that defendant was concerned that Claire was going to leave him. We disagree. Adams testified that defendant told him that he did not want Claire to go to the Dominican Republic because he felt he might lose her. Although defendant points to other evidence supposedly refuting the prosecutor's argument, it was not misconduct for the prosecutor to focus on evidence favorable to the prosecution.

> Defendant next contends that the prosecutor improperly vouched for the credibility of the state's bloodstain expert, Robert Young. "It is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness or as to the guilt of the accused." *State v. Williams* (1997), 79 Ohio St.3d 1, 12, 679 N.E.2d 646. In order for the prosecutor to "vouch" for the witness, the prosecutor's statements must imply knowledge of facts outside the record or place the prosecutor's personal credibility at issue. *State v. Keene* (1998), 81 Ohio St.3d 646, 666, 693 N.E.2d 246. Therefore, a prosecutor may argue that certain evidence tends to make a witness more or less credible, but may not state his own belief as to whether a witness is telling the truth. *State v. Carpenter* (1996), 116 Ohio App.3d 615, 624, 688 N.E.2d 1090.

> Defendant claims that the following comment made during the state's closing argument improperly vouched for the credibility of the state's bloodstain expert, Robert Young:

> This is a man with 30 some years of experience as a police officer and 20 some years as a homicide detective. He had absolutely no motivation to lie, no motivation to skew. He got no extra pay for teaching. He was off on sick leave from heart surgery when he did this.

> (Vol. XIII, Tr. 1784–1785.)

> Viewing the prosecutor's closing remarks as to Young's testimony in their entirety, we find that the challenged comment was aimed toward pointing out the strength of Young's testimony based upon evidence and not on the prosecutor's own sense of whether Young was being truthful. Taken in context, this comment was not a basis for reversal. Further, when faced with a similar statement and argument, i.e., the state's witness had "no motive to lie," the Eighth Appellate District stated that there was not a sufficient basis for it to conclude that the prosecutor's conduct was so egregious as to render the trial fundamentally unfair. *State v. McGrath*, Cuyahoga App. No. 77896, 2002 WL 1041725, 2002–Ohio–2386. Accordingly, defendant's argument fails.

> Finally, defendant contends that the following comment improperly denigrated defendant's bloodstain expert: "Stuart James was being paid $175 per hour, and had he agreed with Bob Young's findings, his $175 an hour payday would have stopped as soon as he said I agree." Although it may be proper to discuss an expert's fee to show bias or pecuniary interest, this comment improperly insinuates that James disagreed with Young only so that he could charge additional fees. Even though improper, this isolated remark did not deny defendant a fair trial. The fifth assignment of error is not well taken, and is overruled.

Under the second prong of the *Maupin* analysis, the court must actually rely on the procedural bar as an independent basis for its disposition of the case. *Caldwell v. Mississippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *see also Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (The last state court rendering a reasoned judgment on the matter must "clearly and expressly" state that its judgment rests on such a procedural bar for the doctrine of procedural default to apply). However, the court may actually enforce its procedural sanction and still review the merits of the case, as long as the decision on the merits is considered an alternative holding. *See Bowling v. Parker,* 344 F.3d 487, 2003 FED App. 0330P (6th Cir. Sept.17, 2003); *see also Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)[.]

*Gooden v. Jeffreys,* 2005 WL 2002362 (N.D.Ohio 2005). In *Harris v. Reed, supra,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308, the Supreme Court noted that a state court "need not fear reaching the merits of a federal claim as an alternative holding." Such were the circumstances here.

The cases referred to by petitioner in support of his argument to the contrary do not assist him. In *Clinkscale v. Carter,* 375 F.3d 430, 441 (6th Cir.2004), the Ohio Court of Appeals declined to reach the merits of a claim of ineffective assistance of counsel due to its preference that the claim be raised in post conviction proceedings. The United States Court of Appeals for the Sixth Circuit concluded that no procedural default had occurred, stating that the petitioner had properly raised his claim on direct appeal and that

The Ohio Court of Appeals' decision denying relief does not even mention an

applicable procedural rule, let alone "clearly and expressly state [ ] that its judgment rests on a state procedural bar." *Frazier,* 343 F.3d at 791 (quoting *Harris,* 489 U.S. at 263, 109 S.Ct. 1038, 103 L.Ed.2d 308). Therefore, not even the first *Maupin* procedural default factor is satisfied.

*Id.* Such are not the circumstances here. Similarly, in *Patterson v. Haskins,* 316 F.3d 596, 605 (6th Cir.2003), the Sixth Circuit concluded that no procedural default had occurred where "the Ohio Court of Appeals made no mention of Patterson's failure to object to the jury instructions during trial" in its dismissal of the claim on its merits, stating "the court did not commit error, plain or otherwise in giving of the jury instructions." *Id.* (emphasis in original.) Finally, *Frazier v. Huffman,* 343 F.3d 780, 791 (6th Cir.2003), also involved the Ohio Supreme Court's merits review of the issue being presented. For all the foregoing reasons, this Court deems the first and second parts of the *Maupin* test to have been met as to claim six. Moreover, because Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal review, *see Williams v. Bagley, supra,* 380 F.3d at 968, this Court concludes that the third part of the Maupin test has also been met.

In claim ten, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to test evidence, *i.e.* a white shirt and brown coat, for gunshot residue. This claim is readily apparent from the face of the record and should have been raised on direct appeal, but was not. *See* Exhibit F to Return of Writ. Further, petitioner may now no longer present this claim to the state courts under Ohio's doctrine of *res judicata. See State v. Cole,* 2 Ohio St.3d 112, 443 N.E.2d 169 (1982); *State v. Ishmail,* 67 Ohio St.2d

16, 423 N.E.2d 1068 (1981); *State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). Petitioner did raise the claim in post conviction proceedings; however, the state appellate court affirmed the trial court's dismissal of the claim as barred under Ohio's doctrine of *res judicata:*

> Here, the trial court applied *res judicata* to deny appellant's ineffective assistance of counsel claims related to trial counsel's failure to: (1) test the coat and white shirt for gunshot residue, and (2) elicit evidence from Schneider's family regarding her emotional state before her death. We rejected these arguments above, noting appellant's insufficient conclusory allegations and referencing trial counsel's effective performance. Thus, *Cole* justifies the trial court's application of *res judicata* on these claims.

Exhibit R to Return of Writ. This Court therefore deems the first and second parts of the *Maupin* test to have been met as to claim ten.

■ The Court must now determine whether the procedural rule barring review of claim ten constitutes an adequate and independent basis upon which to foreclose review of the his federal constitutional claim. This task requires the Court to balance the state's interests behind the procedural rules against the federal interest in reviewing federal claims. *See Maupin v. Smith,* 785 F.2d at 138. Under this analysis, the procedural rule barring claim ten constitutes adequate and independent state grounds for denying relief. The state courts must be given a full and fair opportunity to remedy alleged constitutional defects. The time limitations for filing appeals and the requirement that all available claims be asserted at the first opportunity to do so serve the state's interests in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. Additionally, the doc-

trine of *res judicata* is stated in unmistakable terms in numerous Ohio decisions and Ohio courts have consistently refused to review claims on the merits under that doctrine. *See State v. Cole, supra; State v. Ishmail, supra; State v. Perry, supra.* The Court therefore concludes that the procedural bar for this claim is an adequate and independent basis upon which to foreclose review of claim ten.

In claim eleven, petitioner asserts the ineffective assistance of appellate counsel. Petitioner presented this claim in his delayed application to reopen the appeal pursuant to Ohio Appellate Rule 26(B); however, the appellate court refused to consider the merits of the claim, dismissing his rule 26(B) application as untimely:

> On December 28, 2004, defendant-appellant, Kevin A. Tolliver, filed an application for reopening his appeal and the judgment of this court rendered in *State v. Tolliver,* Franklin App. No. 02AP–811, 2004 WL 625683, 2004–Ohio–1603. On appeal, this court affirmed appellant's judgment of conviction and sentence in the Franklin County Court of Common Pleas for murder with a firearm specification. This court's judgment entry was filed on March 30, 2004.
>
> App.R. 26(B) provides that an application for reopening shall contain a showing of good cause for untimely filing if the application is filed more than 90 days after journalization of the appellate judgment.
>
> Appellant's application was filed almost nine months from journalization of this court's judgment in the appeal. Because the application was not filed within the 90–day period, appellant must show good cause for the untimely filing. Following this court's journalization of its judgment, appellate counsel filed a notice of appeal in the Supreme Court of Ohio on May 13, 2004. On August 4,

2004, the Supreme Court declined jurisdiction and dismissed the appeal as not involving any substantial constitutional question.

Appellant, through his appellate counsel, moved for reconsideration. On September 29, 2004, the Supreme Court denied appellant's motion for reconsideration. On December 28, 2004, exactly 90 days from the date the Supreme Court denied reconsideration, appellant, acting *pro se*, filed the instant application for reopening.

Citing *Eads v. Morgan* (N.D.Ohio 2003), 298 F.Supp.2d 698, appellant claims good cause to delay the filing of his application based on the date the Supreme Court denied his motion for reconsideration. He claims that the 90-day period began to run no earlier than the day following the Supreme Court's denial of reconsideration. Appellant's claim is premised upon the theory that appellate counsel's continued representation through the proceedings in the Supreme Court excused appellant from independently preparing and filing an App.R. 26(B) application for reopening in this court until appellate counsel's representation ended. This court disagrees.

* * *

In *Morgan v. Eads*, 104 Ohio St.3d 142, 818 N.E.2d 1157, 2004–Ohio–6110, the [Ohio] Supreme Court .... held that an application for reopening is not part of the direct appeal. Consequently, while there is a constitutional right to the effective assistance of appellate counsel during the direct appeal, there is no such right during an application for reopening. *Morgan* at ¶ 19–22, 818 N.E.2d 1157. The procedure to appoint counsel under App.R. 26(B)(6)(a), where an indigent defendant raises a genuine issue as to whether he was deprived of the effective assistance of appellate counsel, is one that Ohio has chosen to provide. Ohio has no constitutional obligation to provide counsel to those defendants who file applications under App.R. 26(B). *Morgan* at ¶ 22, 818 N.E.2d 1157.

As the state appropriately argues here, there is no "continued representation" exception to App.R. 26(B)'s filing deadline. Appellant could have filed his application for reopening on his own within 90 days of the journalization of this court's appellate judgment, even though his appellate counsel continued to represent him in an appeal to the Supreme Court. *See State v. Gumm*, 103 Ohio St.3d 162, 814 N.E.2d 861, 2004–Ohio–4755, at ¶ 9.

S.Ct.Prac.R. II(2)(D)(1) states:

After an appeal is perfected from a court of appeals to the Supreme Court, the court of appeals is divested of jurisdiction, except * * * to rule on an application timely filed with the court of appeals pursuant to App.R. 26 * * *.

Thus, this court has jurisdiction to consider an application under App.R. 26(B) even though an appeal of this court's judgment in the direct appeal is pending before the Supreme Court. *See Morgan*.

We recognize that S.Ct.Prac.R. II(2)(D)(1) addresses this court's jurisdiction over an application for reopening filed during an appeal to the Supreme Court rather than the issue of good cause for delay of the application's filing. Nevertheless, we view the rule as directing the defendant to file his application for reopening during the 90-day period regardless of an appeal to the Supreme Court. Moreover, appellate counsel's continued representation during the appeal to the Supreme Court does not prevent the defendant from indepen-

dently filing an application for reopening in this court during the appeal to the Supreme Court. *See Gumm.*

In support of his application, appellant submitted his affidavit in which he avers that his appellate counsel never discussed possible ineffective assistance claims with him until after the proceedings in the Supreme Court were concluded. Appellant also submitted a letter from his appellate counsel dated October 5, 2004, in which appellant was informed:

> Enclosed is a copy [of] the order from the Ohio Supreme Court denying the reconsideration motion. This comes as no surprise. You are now in a position to move into federal court. Obviously if you are filing an App.R. 26(B) motion-you should do that before federal court and again I highly recommend filing that. * * *

The alleged failure of appellate counsel to inform appellant of possible ineffective assistance claims until after the proceedings in the Supreme Court were concluded is not grounds for delay of the filing of the application for reopening. As previously noted, appellant has no right to counsel in the preparation and filing of an application for reopening. Thus, appellate counsel's alleged failure to timely inform appellant of ineffective assistance claims is irrelevant to the question of good cause for the delayed filing.

Appellant also submitted a letter from an assistant state public defender, dated October 22, 2004. The letter states:

> This letter will confirm our telephone conversation with respect to my review of your case for merit to file a delayed application for reopening under Ohio's Appellate Rule 26(B). Given my current caseload and competing deadlines, I can let you know whether

our office can take your case on or before December 1, 2004. * * *

Appellant was already beyond the 90 days when the assistant public defender wrote the letter. Moreover, the letter cannot serve to extend the deadline for filing the application. The assistant state public defender has no authority to extend the App.R. 26(B) deadline, and appellant had no right to rely upon any inference in the letter that the deadline might be extended. *See State v. Sizemore* (1998), 126 Ohio App.3d 143, 709 N.E.2d 943 (public defender's alleged failure to respond to defendant's pleas for assistance did not show good cause for defendant's failure to timely file his application).

Accordingly, for all of the above reasons, appellant's December 28, 2004 application for reopening and his request for an evidentiary hearing are denied.

*State v. Tolliver,* 2005 WL 1055528 (Ohio App. 10 Dist. May 5, 2005), Exhibit Y to Return of Writ. The United States Court of Appeals for the Sixth Circuit has held that the state court's denial of a Rule 26(B) application as untimely constitutes an adequate and independent state ground to preclude federal habeas corpus relief. *Monzo v. Edwards,* 281 F.3d 568, 577–578 (6th Cir.2002). This Court therefore reaches this same conclusion here.

In sum, petitioner has waived his right to present claims five, six, ten, and eleven for federal habeas corpus review. He may still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. Petitioner has failed to establish either cause for his procedural default or actual prejudice from the alleged constitutional violation.

 "[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle,* 271 F.3d 239, 245 (6th Cir.2001), citing *Lucas v. O'Dea,* 179 F.3d 412, 418 (6th Cir.1999)(internal citation omitted).

" '[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson,* 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).

*Maples v. Stegall,* 340 F.3d 433, 438 (6th Cir.2003); *see also Lundgren v. Mitchell,* 440 F.3d 754, 763–64 (6th Cir.2006), citing *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Petitioner's *pro se* status, or "ignorance of the law and procedural requirements for filing a notice of appeal is insufficient to establish cause to excuse his procedural default." *Bonilla v. Hurley,* 370 F.3d 494, 498 (6th Cir.2004), citing *Hannah v. Conley,* 49 F.3d 1193, 1197 (6th Cir.1995). To establish cause, petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley,* 492 F.3d 347, 358 (6th Cir.2007), citing *Jamison v. Collins,* 291 F.3d 380, 386 (6th Cir.2002) (holding that the prosecution's withholding of *Brady* evidence qualified as a "substantial reason for the default that is external to [the petitioner]"). *See, e.g., Maples v. Stegall, supra,* 340 F.3d at 438–39 (failure by prison officials to promptly deliver legal mail may constitute cause for procedural default); *but see Martin v. Vannatta,* unpublished, 175 Fed.Appx. 45 (7th Cir. Mar. 23, 2006)(rejecting petitioner's assertion that inadequate funds for postage constituted cause for his untimely filing where he could have obtained free postage.)

Petitioner argues that the "unique circumstances" of this case render Ohio appellate rule 26(B) [3] an inadequate remedy. Petitioner specifically argues that he was unable to timely present his claim of ineffective assistance of appellate counsel, *i.e.,* habeas corpus claim eleven, to the state courts because his appellate attorney continued to represent him in proceedings before the Ohio Supreme Court during that period of time. Petitioner also states that prison officials waited two months after submission of his delayed Rule 26(B) application before mailing it. *Traverse,* at 46. The record reflects that petitioner signed his Rule 26(B) application on October 27, 2004; the application was filed on December 29, 2004. *See Exhibit V to Return of Writ.*

This Court is not persuaded by petitioner's arguments.

A state procedural rule is adequate if it was "firmly established" and "regularly followed" by the time it was applied in this case. *Ford v. Georgia,* 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991); *Johnson v. Mississippi,* 486 U.S. 578, 587, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).

*Monzo v. Edwards, supra,* 281 F.3d at 577. As discussed, the United States Court of Appeals for the Sixth Circuit has concluded that Ohio's Rule 26(B) meets this standard. *See id.*

Petitioner filed his Rule 26(B) application on December 29, 2004, *see Exhibit v. to Return of Writ,* during the period in which the United States Court of Appeals for the Sixth Circuit took the view that

---

**3.** In what appears to be a typographical error, petitioner actually refers to Ohio Appellate Rule 16(B). *See Traverse,* at 45.

Ohio's Rule 26(B) application formed a part of the direct appeal process and included the right to the assistance of counsel. *See White v. Schotten,* 201 F.3d 743, 752–53 (6th Cir.2000), *overruled by Lopez v. Wilson,* 426 F.3d 339, 352 (6th Cir. 2005)(no right to counsel in Rule 26(B) proceedings). Petitioner indicates that he advised the state appellate court, as good cause for his untimely filing, that three attorneys had refused to represent him in Rule 26(B) proceedings because he remained represented by appellate counsel before the Ohio Supreme Court. *Traverse,* at 46–47. Petitioner further argues that appellate counsel would have been forced to withdraw due to a conflict of interest, had he filed his Rule 26(B) application *pro se* while she continued to represent him. *Traverse,* at 46. However, the record does not indicate that petitioner attempted to obtain the appointment of counsel in Rule 26(B) proceedings. He initially asserted as good cause for his untimely filing that appellate counsel would have been unable to raise any issue regarding her own ineffectiveness in Rule 26(B) proceedings, and that filing a Rule 26(B) application while she continued to represent him would be "counter productive" and "cause animus between the parties." *Exhibit V,* at 4. In his motion for reconsideration of the appellate court's dismissal of his Rule 26(B) application as untimely, petitioner alleged that he had been unable to obtain new counsel while appellate counsel continued to represent him before the Ohio Supreme Court. In support of this allegation, he attached a letter dated July 14, 2003, from attorney William R. Gallagher, which indicates:

I have received and reviewed the information you sent to my office. Enclosed are your materials I am sending back to you. It appears that counsel currently represents you, therefore, I am unable to assist you.

*See Exhibit Z to Return of Writ.* He also attached a letter dated December 3, 2003, from attorney Jane Timonere, which indicates:

I am afraid that I decline representing you in the matter you requested me to review. I have returned your materials with this correspondence. Good luck to you in reversing your conviction.

*See id.* However, petitioner has referred to, and this Court is aware of, no authority prohibiting new counsel from representing petitioner in Rule 26(B) proceedings while counsel continued representing him before the Ohio Supreme Court. Moreover, the Ohio Court of Appeals rejected petitioner's argument in denying his motion for reconsideration as follows:

[I]n his motion for reconsideration under App.R. 26(A), appellant essentially contends that *State v. Gumm,* 103 Ohio St.3d 162, 814 N.E.2d 861, 2004–Ohio–4755, cited in *Tolliver,* supports good cause for his delay. In effect, appellant suggests that this court misapplied *Gumm* or misunderstood its significance. We disagree.

On September 156, 2003, Darryl Gumm filed an App.R. 26(B) application to reopen his appeal. His appeal had been denied by the Hamilton County Court of Appeals on February 16, 1994. The Supreme Court affirmed the appellate court's judgment in 1995. Thus, Gumm waited more than nine years before filing his application.

Gumm argued that he had good cause for missing the . . . deadline because one of the two attorneys who represented him in the initial appeal before the court of appeals continued to represent him for many months after the court of appeals had ruled against him in February 1994. Gumm argued that the attorney could not be expected to challenge his

own effectiveness at any time, let alone within [deadline for filing the App.R. 26(B) application].

In *Gumm,* the court rejected the claim for good cause, explaining, at ¶ 8–9:

Ohio and other states "may erect reasonable procedural requirements for triggering the right to an adjudication," *Logan v. Zimmerman Brush Co.* (1982), 455 U.S. 422, 437[, 102 S.Ct. 1148, 71 L.Ed.2d 265] * * *, and that is what Ohio has done by creating a ... deadline for filing of applications to reopen. Gumm could have retained new attorneys after the court of appeals issued its decision in 1994, or he could have filed the application on his own. What he could not do was ignore the rule's filing deadline.

To be sure, as Gumm contends, "counsel cannot be expected to argue their own ineffectiveness." *State v. Davis* (1999), 86 Ohio St.3d 212, 214[, 714 N.E.2d 384] * * *. Other attorneys—or Gumm himself—could have pursued the application, however. * * *

*See Exhibit BB to Return of Writ.* This Court agrees. Petitioner could have met the time requirements for filing a Rule 26(B) application by filing the application *pro se* or through counsel, either retained or appointed. Doing so would not have required him to either forgo the assistance of counsel before the Ohio Supreme Court or expect his appellate counsel, who continued to represent petitioner before the Ohio Supreme Court, to raise her own ineffectiveness. Further, because petitioner had no right to counsel on appeal to the Ohio Supreme Court, *see Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987)(no right to counsel beyond first appeal of right), counsel's performance in those proceedings would not have been an issue in Rule 26(B) proceedings. The fact that petitioner chose to file

his Rule 26(B) application in the state appellate court only after the Ohio Supreme Court had dismissed his appeal and motion for reconsideration, and at a point when he was no longer represented by that appellate counsel, simply does not constitute cause for petitioner's procedural default, nor does it render Ohio's Rule 26(B) procedures inadequate under *Maupin. See, e.g., Gulertekin v. Tinnelman–Cooper,* 340 F.3d 415, 425 (6th Cir.2003), citing *Coleman v. Thompson,* 501 U.S. 722, 752–53, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)(ineffective assistance of counsel cannot constitute cause where petitioner had no right to counsel in those proceedings). Finally, as noted by the state appellate court, the ninety day time period for filing a Rule 26(B) application had already elapsed by October 27, 2004, when petitioner apparently submitted his application to prison officials for filing. *See Exhibit V to Return of Writ.* Therefore, any delay on the part of prison officials in not mailing the application was not the basis for the state appellate court's dismissal of his application as untimely, nor does any such delay constitute cause for petitioner's procedural default.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 491, 106 S.Ct. 2639; *see also Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269. After review of the record, the Court does not deem this to be such a case.

## III. CLAIMS ONE AND TWO

 In claims one and two, petitioner asserts that he was denied a fair trial due to improper admission of his statement to police, made in violation of

*Miranda v. Arizona, supra,* and after his request for an attorney. The state appellate court rejected this claim as follows:

As defendant's first and third assignments of error are interrelated, they will be combined for purposes of discussion. By the first assignment of error, defendant contends that the trial court erred in failing to suppress statements made by defendant during his custodial interrogation in violation of his rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 10, Ohio Constitution. Defendant cites as authority *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, and their progeny.

Defendant filed a motion to suppress "all statements made by the Defendant during his custodial interrogation on December 29, 2001." (Apr. 4, 2002 Motion to Suppress, at 1.) In response, the state conceded that defendant was in custody at the time the challenged statements were made, but argued (1) that defendant was never subjected to interrogation, and (2) that any questions asked by the police fell under the "booking exception" to *Miranda.* Accordingly, the state contended that *Miranda* warnings were not required.

As previously noted, defendant was taken from the scene and transported directly to the police station. Defendant made several statements both prior to and during transport. Upon arrival at the police station, defendant was placed in an interview room where he was photographed and blood swabs were collected from his body. During this time period, defendant made several statements. The entire process was videotaped.

Prior to ruling on the motion, the trial court reviewed the videotape of the interview as well as separate transcripts of the interview provided by defendant and the state; no testimony or other evidence was considered. The trial court determined that all of defendant's statements were voluntary and not in response to interrogation by law enforcement officials. Accordingly, the court determined that defendant's statements were admissible to the point where defendant specifically named three attorneys. The court further indicated that before the videotape would be played for the jury, the court would confer with counsel for both defendant and the state regarding deleting certain portions of the videotape. The edited videotape was played for the jury without objection.

We begin our analysis from the premise that appellate review of a trial court's ruling on a motion to suppress presents mixed questions of law and fact. See *State v. McNamara* (1997), 124 Ohio App.3d 706, 710, 707 N.E.2d 539. During proceedings on suppression motions, the trial court assumes the role of trier of fact. *State v. Payne* (1995), 104 Ohio App.3d 364, 367, 662 N.E.2d 60. Accordingly, the evaluation of evidence and credibility of witnesses are issues to be determined by the trial court. *State v. Smith* (1997), 80 Ohio St.3d 89, 105, 684 N.E.2d 668. An appellate court is to accept the trial court's factual findings unless they are "clearly erroneous." *State v. Long* (1998), 127 Ohio App.3d 328, 332, 713 N.E.2d 1. In other words, an appellate court must accept the factual determinations of a trial court so long as they are supported by competent and credible evidence. *State v. Harris* (1994), 98 Ohio App.3d 543, 546, 649 N.E.2d 7. The application of the law to

those facts, however, is then subject to de novo review. *Id.*

In *Miranda,* the United States Supreme Court reaffirmed its position that the privilege against self-incrimination protects individuals not only from legal compulsion to testify in a criminal courtroom but, also, from "informal compulsion exerted by law-enforcement officers during in-custody questioning." *Id.* at 461, 86 S.Ct. 1602. "[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467, 86 S.Ct. 1602. Accordingly, the *Miranda* court held that protection of the privilege against self-incrimination during in-custody questioning requires application of special "procedural safeguards." *Id.* at 444, 86 S.Ct. 1602. "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* Unless a suspect "voluntarily, knowingly and intelligently" waives these rights, any incriminating responses to questioning may not be introduced into evidence in the prosecution's case-in-chief in a subsequent criminal proceeding. *Id.*

As noted previously, the state concedes that defendant was in custody at the time he made the challenged statements. Accordingly, at issue is whether defendant was subjected to an "interrogation" by law enforcement officials without being given the requisite *Miranda* warnings. Thus, we must consider what "interrogation" means in this context.

The *Miranda* court referred to "interrogation" as actual "questioning initiated by law enforcement officers." *Id.* The United States Supreme Court later clarified that definition, finding that the goals of the *Miranda* safeguards could be effectuated if those safeguards extended not only to express questioning, but also to "its functional equivalent." *Rhode Island v. Innis* (1980), 446 U.S. 291, 298, 100 S.Ct. 1682, 64 L.Ed.2d 297. The *Innis* court defined the phrase "functional equivalent" of express questioning to include "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Id.* at 301, 100 S.Ct. 1682.

The *Innis* court emphasized, however, that the *Miranda* rules do not prevent the use as evidence of every statement made by an individual in police custody:

" 'Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege* [against self-incrimination] *while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.*' "

(Emphasis sic). *Id.* at 299–300, 100 S.Ct. 1682, quoting *Miranda,* at 478, 86 S.Ct. 1602. Moreover, the court determined that " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300, 100 S.Ct. 1682.

Because defendant's motion to suppress challenged all statements made at the police station, a rather detailed review of the court reporter's transcription of the videotape is necessary. That transcript reveals that shortly after defendant arrived at the police station, a detective informed him that it would be necessary to take photographs of the blood on defendant's body. Defendant spontaneously stated "my girlfriend just killed herself." (Dec. 29, 2001, Tr. 31.) The detective told defendant that they would further discuss what happened after defendant was photographed. Immediately thereafter, defendant stated "the only thing that stopped me from killing myself was my daughter." *Id.* The detective then asked defendant the names of Claire's parents. Defendant reported the names and asked the detective to call them. As his legs were being photographed, defendant spontaneously said, "it's all hers." *Id.* at 33. The detective inquired, "it's all her blood?" *Id.* at 34. Defendant responded, "[w]hen she shot herself and she dropped to the floor. I* * * couldn't even find a phone." *Id.*

After the detective told defendant to change from the bathrobe he was wearing into jail clothing, defendant stated, "[t]here will be no blood any place in the bathroom except * * *." *Id.* at 35. The detective then asked defendant if he knew Claire's father's telephone number. Defendant responded that it was in the cell phone police took from him at the scene. After the detective asked defendant for his home telephone number, defendant averred that he did not have a home telephone number because he and Claire always used cell phones. The detective then inquired, "[t]here's not a phone in that place? A wire phone?" *Id.* at 35–36. Defendant responded, "[t]hat's why I couldn't call anybody faster, I spent 20 minutes running through the house looking for my phone. I couldn't [find] it. I finally found hers." *Id.* at 35–36. Defendant further stated that he had just purchased a $7,500 diamond engagement ring and that he and Claire were not "having any problems." *Id.* After defendant mentioned that Claire had three sisters living in Columbus, the detective asked their names, stating "we are just trying to call somebody." *Id.*

A short time later, defendant spontaneously stated, "[d]o everything that you have to do. The only gunpowder on her-she didn't even know the gun was loaded. I had already pulled the clip out. * * * I just wanted to see my daughter." *Id.* at 37. Defendant continued, "I should have never had guns in the house. * * * I had no problems." *Id.* at 38. Defendant further stated, "[I wanted to] kill myself right there with her. I just tried to see my daughter first." *Id.* at 38–39. He continued, "[i]t's all hers-it's all from me trying to find the bullet hole, trying-I didn't ever see her shoot." *Id.* at 39. Defendant further averred, "[t]here would be more [blood on his body] but I was trying to see my daughter, so I did wash." *Id.*

After the detective ascertained defendant's name, address, and date of birth, he told defendant he would need to ask defendant some questions about the circumstances of Claire's death. Defendant responded that he would fully cooperate. The detective then told defendant that before questioning could commence, he would have to advise defendant of his constitutional rights. Instead of explaining defendant's rights to him, the detective asked defendant about his educational background, whether he had vision or hearing problems, and whether he had consumed

any alcohol in the last 24 hours. After defendant responded that he and Claire had consumed alcohol, the detective inquired as to when defendant last had a drink. Defendant answered that he was unsure about the time because after the shooting, he spent 20 minutes looking for Claire's cell phone and trying to perform CPR on her.

The detective then asked defendant if he was currently "high" or "buzzed," to which defendant replied, "[o]ther than that, psychologically sound in mind if that is possible. My girlfriend just shot herself. We just bought a house today. We were getting engaged. We were planning our wedding tonight." *Id.* at 45. When the detective asked defendant if he was on prescription drugs, defendant responded that Claire was "supposed to take Paxil," that she "didn't mean it," and that "[s]he didn't even finish her sentence." *Id.* at 45.

The detective then told defendant he was going to "go over this rights waiver" with him. *Id.* at 45–46. Defendant interrupted, stating:

I am not of sound mind or-I am not capable of waiving anything right now. I will give you any verbal statement to give you all the information you need to investigate, but I am not going to sign off on anything that has to do with my rights. If you don't want to hear what I have to say, fine. It was my fault for bringing the gun out. But I was in the bathroom by myself when she came in. I was getting the other gun out, and I was taking them out of the house. She had not taken her medication. She was upset about her family and their dislike for me and that she might be pregnant. And beyond that * * * we had no problems. We were out with friends. We were discussing our wedding, and I just lost my whole world.

*Id.* at 46–47.

After this statement, the detective averred, "I understand you don't want to give a statement, but for the record I am going to go over it with you. Who knows, you might change your mind. I am going to advise you of it, okay. * * * I am just going to do the procedure and * * * after that, you can decide on what you are going to do." *Id.* at 47.

Defendant responded, "[y]ou say that I have the right to remain silent. I will be silent. You can get any information that you need for this investigation. Before that. The minute you say it, I have nothing more to say to you." *Id.*

The detective then averred, "I can't ask you anything pertinent to the investigation without me advising you of your rights first. * * * You just mentioned a gun. I don't know if it's more than one gun in the place, stuff like that I need to ask you but—." *Id.* Defendant interrupted, stating "I am willing to share all this information with you because I have nothing to hide; however, I am not of sound mind. She was in the middle of a sentence when she accidentally shot herself. I feel it was my fault, because she didn't know the gun was loaded. She said, 'What do you want me to—' pow. I turned around and she was falling at my feet. I have nothing—." *Id.* at 47–48.

The detective then averred, "I understand. You put me in a corner, because there are questions I need to ask you. When you are saying, she shot herself, I need to know where she shout [sic] herself—* * * I need to know where, you know, the wound is on the body." *Id.* at 48.

Defendant responded:

I couldn't find it. I wanted to put my hands on it. I couldn't find it I tried to

give CPR. I tried to hold it. I could feel her jaw, felt like it was broken but I couldn't find the entryway. I couldn't find the exit wound. I just—I just saw blood. * * * I went across the hall, banged on the door and * * * there was nobody home. I finally found a phone, * * * tried to call somebody, got my ex-wife, because I wanted to see my daughter and tried to clean up myself and just in the hallway before she got there.

We were not having any problems. We were not having any fights. * * * [W]e were discussing the problems with her family and how they felt about the fact that she might be pregnant, and we hadn't actually gotten engaged yet. You can talk to my jeweler and he will tell you that. I had been shopping for a ring to expediate the situation. We were going to the Dominican Republic for two months, starting in January, I was just about to start my new business in Miranova. * * *

*Id.* at 48–49.

The detective then asked defendant if he wanted to help the police with the investigation. Defendant indicated that he would help any way he could, but he did not have an attorney. He further averred that "[w]e just closed on our house today, and I put all of my money in her bank account for that to happen. So I don't have any funds available." *Id.* at 49–50.

The detective assured defendant that an attorney would be provided for him:

"We can call you an attorney. I mean, we wake them up all the time. * * * You know, you don't have to answer any questions right now, and that's fine. But it's two parts to every story. We go by what we see at the scene. Then we just have to process evidence from the scene and take it as that. But she can't tell us what happened, because she is

dead. You are the only one that can tell us, and all I want to do is go over your rights, just tell you that you do have the right to remain silent, and anything you say is public in this room. * * * [I]t can be used against you in court."

*Id.* at 50.

To this statement, defendant replied, " * * * [s]top talking right now. Find me someplace where I can be by myself, so I don't have to interact with other people right now until I can see my attorney, and see my daughter * * *." *Id.* at 50–51.

When the detective asked defendant whether he wanted to make a statement about what happened, defendant responded, " * * * I will tell you anything you want to know that will help you in your investigation. But I will tell you nothing that will incriminate me * * * I feel bad enough * * * about owning the gun, she never fired the gun. The very first time in her life she fired a gun she died." *Id.* at 51.

The detective then stated, "[y]ou are saying you will tell me anything. What you are saying is I can ask you questions about what happened? * * * Is that what you are saying?" *Id.* at 51–52. Defendant replied "I have already told you, I am not of sound mind to make this decision." *Id.* at 52. The detective again asked "[s]o you don't want to talk to us then?" *Id.* Defendant responded "I don't want to talk to you. I want you to clearly understand what happened." *Id.* The detective stated "[t]hat's what I want to know. I want it too, because right now I am confused. I am very confused, because it doesn't look like she shot herself to me. I don't know if a burglar came in there. * * * " *Id.*

Defendant responded:

There was no burglar. There was no one in the house but the two of us. We were naked, and we were about to make love, and we were having a discussion about the fact she might be pregnant. * * *. [A]nd I was like "look, your family—" she was talking about how they would respond. I said, "I don't care about that," and she picked up my gun, said, "Well, what do you want me to—" and my back was to her, and she pulled the trigger and fell to the ground by my feet as I turned around, and I can't say anything more than that. If you can find any residue or gun powder on my hands—if you don't find any on hers, then you can come and you can ask me any questions beyond that you want to. Forensics will show you that I did not pull any triggers. There was one shot. The second shot would have been fired. I put the clip in. I was writing a note [to] my daughter, and I had called my wife after I was pretty certain that my girlfriend was dead, my fiancé was dead, and I, at that point, was done. It would have been one second shot had I got to spend time with my daughter before you showed up.

*Id.* at 52–53.

The detective then asked defendant if he wanted the police to call an attorney. Defendant responded that he would not know what attorney he could trust, given the detective's previous statement that it did not look like Claire shot herself. After the detective acknowledged that he had been at the scene, defendant said, "I spent 20 minutes looking through that house. * * * We were packing to move into our house that we had been renovating for a year together." *Id.* at 54.

The detective then averred, "[l]et's try this a different way, Kevin. Since I am restricted on asking you any questions without you being advised, tell me what do you think your constitutional rights are. You know you have a right to remain silent, right?" *Id.* at 54. Defendant answered, "I am not going to address those issues as such in that direction." *Id.* After the detective stated, "I can't sit here all night and wait for you to volunteer." *Id.* Defendant said, " * * * put me someplace by myself." The detective responded, "[w]ell, no, you leave here without giving us a statement, without willing to talk to this thing, we converse back and forth with you, you can't go anywhere by yourself. If you leave here, more than likely without giving me a statement, you are going to go to the county until we can sort this out." *Id.* at 54–55. After defendant said, "[a]nd you already said it didn't look like," the detective replied, "[t]o me, but I don't know the story. That's what I said before, there is two sides to every story. I don't know how she ended up the way she did. I don't know how blood ended up the way it did until somebody tells me. She can't tell me. All I can do is look at the walls, look at the floor, look at the sink where somebody washed up at * * * look at the bathroom where somebody put blood in." *Id.* at 56.

Defendant reiterated that he washed his hands because his daughter was on her way to the apartment, that he wanted to see her, and that he wanted to kill himself. *Id.* To this statement, the detective replied "[b]ut see that stuff we need to get into it. I can't dwell into that. That statement you just made, I can't dwell into that because you don't want to-you don't want to go over the rights waiver with me. If I dwell into it, you know, I am going to get chewed up for it. So you can say anything you want.

You can say, hey, I did this, I did that. But it restricts me from asking you questions." *Id.* The detective continued, "[w]ell, all I'm saying I can't sit here and babysit you. If you want to give a statement about what happened, we are going to have to go over the rights waiver, and you are going to have to waive your rights to talk to me. If you don't want to do that, it is nothing else I can talk to you about." *Id.*

Defendant responded, "Let me talk to the attorney before I can waive those rights." *Id.* Thereafter, defendant gave the detective the names of three attorneys to contact. After one of the attorneys arrived at the police station, the detective read defendant his *Miranda* rights and the rights waiver form. After conferring with counsel, defendant indicated that he understood his rights, refused to waive those rights, and refused to give a statement.

Defendant first contends that two of the questions posed by the detective early in the interview were designed to, and in fact did, elicit incriminating responses from defendant that were subsequently used against him at trial. Defendant contends that all statements made by defendant subsequent to these two questions must be suppressed.

Defendant points first to the detective's question, "[i]t's all her blood?," to which defendant responded that Claire shot herself and dropped to the floor. *Id.* at 34. Defendant claims that the state used his response to make a point that defendant was covered in Claire's blood. Immediately prior to the detective's question, defendant voluntarily stated "it's all hers." *Id.* at 33. The detective's question was thus posed only as a means of clarifying defendant's volunteered statement. Follow-up questions clarifying a defendant's volunteered

statement fall beyond the type of questioning *Miranda* characterizes as interrogation. *State v. Tucker* (1998), 81 Ohio St.3d 431, 437, 692 N.E.2d 171 (further interaction between defendant and guards "flowed from the initial volunteered incriminating statement").

Moreover, even if admission of the statement was error, such error was harmless. *See State v. Edgell* (1972), 30 Ohio St.2d 103, 283 N.E.2d 145, paragraph three of the syllabus. ("The use of a statement against an accused taken in transgression of *Miranda* may be found to be harmless error under the rule of *Chapman v. California* [1967], 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705.") Appellant's answer, that Claire shot herself, was identical to and repetitious of the statement he made at the scene of the shooting before his arrest. Further, laboratory tests performed by the police confirmed that all the blood on defendant's body was Claire's.

Defendant next complains that the detective's question "[t]here's not a phone in that place? A wire phone?" amounted to interrogation which elicited an incriminating response from him, that is, that he could not contact anyone sooner than he did because he could not find a telephone. *Id.* at 35. Defendant contends that the state used his statement in an effort to prove that he lied when he said he could not find a telephone, given that other evidence established that he had access to both Claire's cell phone, which was in the apartment, and two cell phones which were recovered from his vehicle.

The detective's question was prompted by defendant's desire to assist in finding the telephone numbers of Claire's parents. When the detective asked defendant if he knew the names of Claire's parents, defendant reported the names

and asked the detective to notify them. After defendant reported the name of Claire's father, the detective asked defendant if he knew his telephone number. Defendant said it was in the cell phone police took from him at the scene. At this juncture, the question of defendant's home number came up, undoubtedly because the detective was going to call the apartment and have one of the officers there retrieve the father's telephone number from the cell phone. Because defendant asked the detective to notify Claire's parents, the detective's question was a proper follow-up to that request.

Moreover, admission of defendant's statement was harmless. Seevers confirmed that the apartment lacked a wired telephone line. Further, defendant made other statements indicating that he could not find a telephone, including while being transported to the police station and in the note found at the scene.

Because we have determined that the statements made by defendant in response to the foregoing two questions need not have been suppressed, we cannot agree with defendant's contention that all statements made by defendant subsequent to these two questions must be suppressed; accordingly, we will not address every statement made by defendant. However, we will address several specific statements that defendant argues resulted from improper interrogation.

Defendant complains about the detective's comment that defendant had mentioned a gun and that he needed to ask defendant whether there was more than one gun in the apartment. In response to this comment, defendant stated that Claire accidentally shot herself while she was in the middle of a sentence, and that

it was his fault because she did not know the gun was loaded.

The detective's comment about the gun was a follow-up to defendant's previous spontaneous statement that it was his fault for bringing out the gun. In addition, we note that in offering the voluntary statement, defendant interrupted the detective's attempt to advise defendant of his *Miranda* rights. As noted in *Miranda*, the police need not interrupt a suspect's volunteered statements to give the warnings. Further, admission of defendant's statement was harmless. As we have previously noted, defendant had already stated at the scene that Claire shot herself. Further, defendant's note at the scene indicated that Claire did not know the gun was loaded.

Defendant next challenges the detective's question asking defendant where Claire shot herself. In response, defendant gave a long statement, only the first part of which was actually responsive to the detective's question. Defendant contends that the state used his response in an effort to prove that he lied when he said it felt like Claire's jaw was broken, since the deputy coroner testified that Claire sustained soft tissue damage.

Although the detective's inquiry constituted express questioning in violation of *Miranda*, admission of defendant's response was harmless. Although Norton testified that Claire sustained soft tissue damage, he also testified that several of the back teeth on the upper right side of her mouth had been damaged; the state's bloodstain expert concurred. Given this testimony, it is entirely possible that the jury found defendant's assertion that it felt like Claire's jaw was broken to be credible.

Defendant challenges several other statements made by defendant on the

basis that the state utilized the statements in an attempt to paint defendant as a liar. For example, defendant complains about statements that he purchased a $7,500 engagement ring for Claire, that he wanted to see his daughter, and that he and Claire were planning their wedding. These statements were volunteered by defendant; they were not the product of interrogation. Regarding defendant's statement that Claire was nude, other evidence established that same fact. Indeed, Coulter testified that he found Claire nude on the floor of the bathroom.

Defendant also asserts that the prosecution's use of statements made after he requested an attorney violated his right to have counsel present during custodial interrogation. Defendant contends that his statement, "[s]top talking right now * * * until I can see my attorney * * *" constituted an invocation of his right to counsel. *Id.* at 50–51.

In *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378, the United States Supreme Court held that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation. A request for counsel must be clear and unequivocal. *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362. Defendant's remark is no more an unequivocal request for counsel than Davis', "maybe I should talk to a lawyer." *Id.* at 455, 114 S.Ct. 2350. Further, even if defendant's remark could be construed as an invocation of the right to counsel, admission of the statements following the request was harmless, given that defendant had already made similar statements, or other admissible evidence confirmed those statements.

Finally, even assuming, *arguendo*, that all the statements made by defendant at the police station should have been suppressed, we cannot agree with defendant's contention that he could not have been convicted absent the statements. Other evidence supports defendant's conviction. Claire's cell phone records established a period of 45 minutes after Claire was shot during which defendant did not call the police. During this same period, defendant encountered a neighbor with whom he had a casual conversation, wherein he did not mention the shooting, nor seek the neighbor's aid. The deputy coroner found it unlikely, based upon forensic evidence, that Claire either committed suicide or shot herself accidentally. The state's bloodstain expert opined that Claire's body had been repositioned after she was shot. Finally, defendant's cellmate testified that defendant confessed to him that he murdered Claire. The first assignment of error is not well-taken, and is overruled.

*State v. Tolliver, supra,* Exhibit F to Return of Writ. The findings of the state appellate court are presumed to be correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Further, a federal habeas court cannot grant relief unless the state court contravenes or unreasonably applies federal law or issues a decision based upon an unreasonable determination of the facts:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's determination is contrary to federal law when the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or on indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an unreasonable application of federal law when the state court correctly identified the applicable legal principle from Supreme Court precedent, but applied that principle to the facts before it in an unreasonable manner. *Id.* at 413, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

*Maldonado v. Wilson*, 416 F.3d 470, 475 (6th Cir.2005). Petitioner has not met this standard here. *See Williams v. Taylor*, *supra*.

 The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The privilege against self-incrimination prohibits the government from using any statement against a criminal defendant "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona, supra*, 384 U.S. at 444, 86 S.Ct. 1602. A person being questioned while in custodial interrogation must be warned "that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed." *Id.* However, "[w]here a defendant makes a voluntary statement without being interrogated or pressured by an interrogator ... the statements are admissible despite the absence of *Miranda* warnings." *United States v. Legette*, 2007 WL 1796230 (E.D. Michigan June 20, 2007), citing *United States v. Murphy*, 107 F.3d 1199, 1204 (6th Cir.1997) (citing *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 300–301, 100 S.Ct. 1682; *see also U.S. v. Avery*, 717 F.2d 1020, 1024 (6th Cir. 1983).... [T]he "latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682.

"A practice that the police know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseen results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably

likely to elicit an incriminating response." *Id.* at 301–302, 100 S.Ct. 1682. In a footnote, the Court also explained that "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id.* at 302 n. 8, 100 S.Ct. 1682.

*Id.* Law enforcement officers

must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation until such time as the defendant reinitiates communication or counsel is made available. *Edwards v. Arizona,* 451 U.S. 477, 484, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

*Zaffino v. Konteh,* 2006 WL 2360902 (N.D.Ohio August 15, 2006). However,

where a request to cease questioning is "ambiguous or equivocal" in that a reasonable officer in light of the circumstances would have understood that the suspect *might* be invoking the right [to remain silent],

cessation of questioning is not required. *Calhoun v. McKee,* 2007 WL 1452911 (E.D. Michigan May 15, 2007), quoting *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). The United States Court of Appeals for the Sixth Circuit has likewise held that the defendant must clearly and unequivocally assert his right to silence before police are required to stop questioning him. *United States v. Hurst,* 228 F.3d 751, 759–60 (6th Cir.2000). As discussed by the state appellate court, a statement obtained by police in violation of *Miranda* is subject to the harmless error doctrine. *Arizona. v.*

*Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

Petitioner contends that Detective Viduya questioned him without advising him of his *Miranda* rights, and that all of his statements to police were therefore inadmissible. *Traverse,* at 7–11. Petitioner argues that the Ohio Court of Appeals unreasonably applied *Rhode Island v. Innis, supra,* and improperly conducted a harmless error analysis. *Id.,* at 16. Further, petitioner contends that he unequivocally asserted his right to stop questioning when he stated:

I am not of sound mind ... or I am not capable of waiving anything right now. I will give you any verbal statement to give you all the information you need to investigate, but I am not going to sign off on anything that has to do with my rights.

*Transcript of Videotaped Statement,* at 46; Traverse, at 18. This Court is not persuaded by petitioner's arguments.

The record does not reflect that petitioner clearly asserted his right to remain silent. He refused to sign a rights waiver form, but he agreed to give any verbal statement needed. Further, after stating that he was "not of sound mind" and incapable of waiving his rights, he immediately thereafter continued to make statements about the events of the night in question:

If you don't want to hear what I have to say, fine. But she is the only one with gunpowder on her, okay. It was my fault for bringing the gun out. But I was in the bathroom by myself when she came in. I was getting the other gun out, and I was taking them out of the house. She had not taken her medication. She was upset about her family and their dislike for me and that she might be pregnant. And beyond that— and beyond that, we had no problems. We were out with friends. We were

discussing our wedding, and I just lost my whole world.

*Id.*, at 46–47. When the detective then attempted to read him his *Miranda* rights, petitioner interrupted him and ultimately stated that he would talk because he "had nothing to hide":

OFFICER: I understand you don't want to give a statement, but for the record I am going to go over it with you. Who knows, you might change your mind. I am going to advise you of it, okay?

DEFENDANT: You can advise me. I'm telling you right now that—

OFFICER: I am just going to do the procedure and then ... after that, you can decide on what you are going to do.

DEFENDANT: You say that I have the right to remain silent. I will be silent. You can get any information that you need for this investigation. Before that. The minute you say it, I have nothing more to say to you.

OFFICER: I can't ask you anything pertinent to the investigation without me advising you of your rights first (inaudible). You just mentioned a gun. I don't know if it's more than one gun in the place, stuff like that I need to ask you but—

DEFENDANT: I am willing to share all this information with you because I have nothing to hide; however, I am not of sound mind. She was in the middle of a sentence when she shot herself. I feel it was my fault, because she didn't know the gun was loaded. She said, "What do you want me to—" pow. I turned around and she was falling at my feet. . . .

*Id.*, at 47–48.

Petitioner also asserts that he unequivocally asserted his right to remain silent shortly thereafter, when he stated:

All right. Wait. Stop talking right now. Find me someplace where I can be by myself, so I don't have to interact with other people right now until I can see my attorney and see my daughter, because beyond seeing my daughter (inaudible)—I just lost my whole world.

*Id.*, at 50–51; Traverse, at 18. However, again, the record reflects that immediately after making this statement, petitioner said he was willing to talk:

OFFICER: So what you are saying is you don't want to talk about this or give a statement about what happened?

DEFENDANT: I am saying, I will tell you anything you want to know that will help you in your investigation. But I will tell you nothing that will incriminate me because—

OFFICER: That's what we're going over this for. DEFENDANT: I feel bad enough—

* * *

OFFICER: You are saying you will tell me anything. What you are saying is I can ask you questions about what happened?

* * *

Is that what you are saying?

DEFENDANT: I have already told you I am not of sound mind to make this decision.

OFFICER: So you don't want to talk to us then?

DEFENDANT: I don't want to talk to you. I want you to clearly understand what happened.

*Id.*, at 51–52.

Upon review of the entire record, this Court simply is not persuaded that the state appellate court's decision rejecting claims one and two was contrary to or an unreasonable application of federal law, or an unreasonable determination of the

facts. 28 U.S.C. § 2254(d), (e). Further, and for the reasons detailed by the Ohio Court of Appeals, this Court agrees that any error in admission of petitioner's statement(s) to police was harmless in view of other evidence establishing his guilt. This Court is not persuaded that the state appellate court improperly applied the harmless error test.

A constitutional error is harmless when "it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Neder* [*v. United States,* 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting *Chapman,* 386 U.S. at 24, 87 S.Ct. 824, 17 L.Ed.2d 705).] We may not grant [a] habeas petition, however, if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the Ohio Court of Appeals applied harmless-error review in an "objectively unreasonable" manner.

*Eddleman v. McKee,* 471 F.3d 576 (6th Cir.2006), quoting *Mitchell v. Esparza,* 540 U.S. 12, 17–18, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003)(*per curiam* ), and applying the *Chapman* harmless error test and deference under the Antiterrorism and Effective Death Penalty Act where, as here, the state court made a harmless error determination. *Id.*

For all the foregoing reasons, and for the reasons detailed by the state appellate court, this Court likewise concludes that claims one and two are without merit.

### IV. CLAIMS THREE and FOUR

In claim three, petitioner asserts that he was denied a fair trial because the prosecutor improperly argued that petitioner's invocation of his right to silence indicated guilt, in violation of *Doyle v. Ohio, supra,* 426 U.S. at 610, 96 S.Ct. 2240. Specifically, petitioner objects to the fol-

lowing statement made by the prosecutor during closing argument:

Well, actually, the exact quote was, "I'm really in trouble." He told that to Natasha. He was right. He really was in trouble. But she told you it was because he was afraid of this. Was he afraid he would get accused of something he didn't do? Or was he afraid of the fact that a lot of his story didn't make sense? Suicide, accident, suicide, then accident, or that some of his comments didn't make sense. *Does a distraught person say, "I'm not psychologically sound of mind"? That is not possible. Are those the statements of an innocent man?*

*Transcript,* at 1848; see Traverse, at 18. In claim four, petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to object to the foregoing statement. Because these claims are related, this Court will consider them together.

The state appellate court rejected petitioner's *Doyle* claim as follows:

By the third assignment of error, defendant contends that the prosecution misused defendant's invocation of his right to silence as evidence of guilt in derogation of *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. Specifically, defendant argues that the prosecution improperly commented on defendant's assertion of his right to remain silent by stating in closing argument, "[d]oes a distraught person say, 'I'm not psychologically sound of mind?' That is not possible. Are those the statements of an innocent man?" (Vol. XIII, Tr. 1848.)

The prosecutor's comment did not invoke the protections enunciated in *Doyle.* In that case, the United States Supreme Court held that the state may not seek to impeach a defendant's excul-

patory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest. Here, the prosecutor's comment did not refer to any purported invocation of the right to remain silent. Rather, the prosecutor referenced defendant's statement in an attempt to cast doubt on the theory that defendant was distraught at Claire's death. The third assignment of error is not well-taken, and is overruled.

*State v. Tolliver, supra;* Exhibit F to Return of Writ. Again, these findings are presumed to be correct. 28 U.S.C. § 2254(d), (e). Petitioner has failed to establish that the state appellate court's decision is so unreasonable as to justify federal habeas corpus relief. *See Williams v. Taylor, supra.*

In *Doyle v. Ohio, supra,* the United States Supreme Court held:

> [B]ecause *Miranda* warnings contain an implicit assurance "that silence will carry no penalty," 426 U.S., at 618, 96 S.Ct., at 2245, " 'it does not comport with due process to permit the prosecution during the trial to call attention to [the defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony,' " *id.,* at 619, 96 S.Ct., at 2245 (quoting *United States v. Hale,* 422 U.S. 171, 182–183, 95 S.Ct. 2133, 2139, 45 L.Ed.2d 99 (1975) (WHITE, J., concurring in judgment)). Accordingly, the Court in *Doyle* held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S., at 619, 96 S.Ct., at 2245.

*Greer v. Miller,* 483 U.S. 756, 762–63, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987). *Doyle* does not apply to cross examination on a defendant's inconsistent statements "because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *Anderson v. Charles,* 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).

> *Doyle* applies only in the context of post-*Miranda* silence. *See Fletcher v. Weir,* 455 U.S. 603, 607, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (holding that *Doyle* does not apply to the use of post-arrest, pre-*Miranda* silence); *Jenkins v. Anderson,* 447 U.S. 231, 238–39, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (holding that *Doyle* does not apply to the use of pre-arrest, pre-*Miranda* silence); *Combs v. Coyle,* 205 F.3d 269, 280 (6th Cir.2000) (noting that, under *Doyle,* receipt of the *Miranda* warnings is key).

*United States v. Peyton,* 183 Fed.Appx. 539, 2006 WL 1479031 (6th Cir. May 26, 2006). To determine whether a *Doyle* violation has occurred, a reviewing court must "look at all the surrounding circumstances." *Butler v. Rose,* 686 F.2d 1163, 1170 (6th Cir.1982).

> [T]o find that a prosecutor has improperly commented on a defendant's Fifth Amendment right to remain silent, we must find one of two things: either that the prosecutor's manifest intention was to comment on the accused's failure to testify, or that the remark was of such a character that the jury would necessarily take it to be a comment on the failure of the accused to testify. *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988); *Steele v. Taylor,* 684 F.2d 1193, 1204 (6th Cir.1982), *cert. denied,* 460 U.S. 1053, 103 S.Ct. 1501, 1502, 75 L.Ed.2d 932 (1983).

*United States v. Ursery,* 109 F.3d 1129, 1134–35 (6th Cir.1997). Neither of the foregoing factors is presented by this case.

Petitioner nonetheless argues that the Ohio Court of Appeals unreasonably misapplied *Doyle* and that its decision denying his claim constituted an unreasonable determination of the facts because the appellate court concluded that the prosecutor did not refer to petitioner's invocation of the right to remain silent. *Traverse,* at 18–19. Respondent further contends that the reasoning of *Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), compels relief in this case. This Court disagrees.

In *Wainwright v. Greenfield, supra,* the Supreme Court held that *Doyle* prohibits the prosecutor from using the defendant's post-*Miranda* silence as evidence that he was not insane at the time of the offense. *Id.,* at 291–92, 106 S.Ct. 634. In a footnote, the Supreme Court stated:

> With respect to post-*Miranda* warnings "silence," we point out that silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted.

*Id.,* at 295, n. 13, 106 S.Ct. 634. At petitioner's trial, the challenged statement of the prosecutor was neither intended nor of such character as to be perceived by the jury as a reference to petitioner's invocation of his right to silence. *See United States v. Ursery, supra.* Indeed, as was detailed by the state appellate court, petitioner interrupted police several times stating that he was "not of sound mind." Immediately thereafter, however, he continued to make statements to police regarding the events on the night in question. *See* Exhibit F to Return of Writ.

> The Supreme Court's holding in *Doyle* "has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings." *United States v. Crowder,* 719 F.2d 166, 172 (6th Cir.1983).

*Todorov v. Romanowski,* 2007 WL 1219040 (E.D. Michigan April 25, 2007). Such are not the circumstances here.

Petitioner's claim of ineffective assistance of counsel for failing to object to the foregoing comments is likewise without merit. Because the state appellate court did not address the merits of this claim, this Court must conduct a *de novo* review. *Maples v. Stegall,* 340 F.3d 433, 437 (6th Cir.2003), citing *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must over-

come the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.*, at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, at 697, 104 S.Ct. 2052. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Court determines that petitioner has failed to satisfy one prong, it need not consider the other. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

Because this Court concludes that the challenged statement of the prosecutor did not violate *Doyle*, petitioner cannot establish either prong of *Strickland* merely because his counsel failed to object to that statement.

Claims three and four are without merit.

## V. CLAIM FIVE

In claim five, petitioner asserts that he was denied a fair trial because the trial court admitted into evidence a white shirt discovered by the victim's family in the clothes hamper of her home, despite an "unreliable chain of custody." *Petition*, at 5. The state appellate court rejected this claim as follows:

> [D]efendant contends that the trial court abused its discretion in admitting the white shirt into evidence without the state having maintained a proper chain of custody. Defendant also maintains that the probative value of the shirt was substantially outweighed by the danger of unfair prejudice, resulting in the denial of a fair trial to defendant.

We begin our analysis with the well-established principle that "[t]he trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, [an appellate] court should be slow to interfere." *State v. Hymore* (1967), 9 Ohio St.2d 122, 128, 224 N.E.2d 126. An abuse of discretion connotes more than an error of law or judgment; it connotes a decision that was arbitrary, unconscionable, or unreasonable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." A "chain of custody" is part of the authentication and identification mandate set forth in the rule and the state has the burden of establishing the chain of custody of a specific piece of evidence before it can be admitted at trial. *State v. Brown* (1995), 107 Ohio App.3d 194, 200, 668 N.E.2d 514. Although the state bears the burden of establishing a proper chain of custody, that duty is not absolute. *State v. Moore* (1973), 47 Ohio App.2d 181, 183, 353 N.E.2d 866. "A strict chain of custody is not always required in order for physical evidence to be admissible." *State v. Wilkins* (1980), 64 Ohio St.2d 382, 389, 415 N.E.2d 303. "The practicalities of proof do not require the state to negate all possibilities of substitution or tampering. The state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur." *Moore*, supra. A chain of custody may be established by direct testimony or by inference. *State v. Conley* (1971), 32 Ohio App.2d 54, 62, 288 N.E.2d 296.

Further, any breaks in the chain of custody do not affect the admissibility of evidence but, rather, the weight to be afforded such evidence. *Id.*

Here, the state established that the police closely guarded the crime scene while it was being processed. Following processing, the locks on the apartment were changed, with only apartment personnel having access to the keys. Those persons permitted access to the apartment before the shirt was discovered denied altering or tampering with the shirt. After Reid discovered the shirt in the clothes hamper, she reported it to Mr. Schneider, who then retrieved the shirt from the apartment. Mr. Schneider then contacted the police, who retrieved the shirt and submitted it to the CPD property room. Mr. Schneider testified that he did not alter the shirt before turning it over to the police.

Based on the evidence presented, we find that the state effectively established to a reasonable certainty that no substitution, alteration or tampering of the shirt occurred. Therefore, we find that the trial court did not abuse its discretion by allowing the shirt into evidence.

*State v. Tolliver, supra,* Exhibit F to Return of Writ.

Federal habeas review of state court evidentiary rulings is extremely limited. *Waters v. Kassulke,* 916 F.2d 329, 335 (6 Cir.1990). Evidentiary questions generally do not rise to a constitutional level unless the error was so prejudicial as to deprive a defendant of a fundamentally fair trial, thereby violating due process. *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988); *see also Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.1983). When such errors are alleged, the federal court's inquiry in reviewing these claims is directed to whether the evidence was rationally connected to the crime charged. *Carter v.*

*Jago,* 637 F.2d 449, 457 (6 Cir.1980). Such are the circumstances here.

Claim five is without merit.

## VI. CLAIM SEVEN

In claim seven, petitioner asserts that he was denied due process, a fair trial and the effective assistance of counsel because the trial court failed to make a timely ruling on his motion to compel the prosecutor to disclose Claire Schneider's diary. Petitioner contends that the diary would have assisted the defense because it refuted the prosecution's theory of the case as to petitioner's motive for murdering Claire, showed that he and Claire were planning to get married, constituted evidence of her depression, and described her treatment with the antidepressant medication, Paxil. Additionally, petitioner contends that the diary established that Claire was "histrionic, melodramatic, and theatrical," and capable of suicide. *Petition,* at 6; *see also Traverse,* at 42–43.

The state appellate court rejected this claim as follows:

Defendant's sixth assignment of error contends that the trial court erred in failing to rule upon his motion to compel the prosecution to provide access to Claire's diary.

On February 13, 2002, defendant filed a motion seeking access to certain property seized from the apartment after the shooting. One of the requested items was Claire's diary. On March 5, 2002, defendant filed a motion to compel the state to provide defendant access to the diary. In a decision and entry filed March 8, 2002, the trial court determined that it would review the diary in camera to determine whether it should be provided to the defense. At a pretrial hearing on March 25, 2002, the trial court indicated that it had not yet read

the diary. In a February 21, 2003 entry correcting the record, the trial court indicated that it had reviewed the diary, but never ruled on defendant's motion to compel. The court further indicated that it did not recall whether it gave defense counsel an opportunity to review the diary.

The failure to rule upon a pretrial motion prior to trial is error. *State v. Tolbert* (1990), 70 Ohio App.3d 372, 388, 591 N.E.2d 325. Such error is harmless, however, unless it adversely affects the substantial rights of the accused. *Id.*

Here, the trial court erred when it failed to rule upon defendant's pretrial motion to compel. The focal issue therefore is whether the trial court's error affected a substantial right of the defendant.

Defendant contends that the trial court's failure to provide him access to the diary prejudiced his defense because it corroborated his claim that he and Claire were happy together and were planning to marry. Defendant contends that this evidence refutes the prosecution's theory that Claire was attempting to escape her controlling boyfriend and that defendant killed Claire to prevent her from leaving him. Upon review of the diary, we disagree. The last entry in the diary is dated October 7, 2001, and predates Claire's death by almost three months. Thus, the diary has little probative value regarding the state of their relationship at the time of Claire's death. Further, although some of the entries discuss Claire's love for and desire to marry defendant, including, we note, the last entry, other entries suggest problems in their relationship stemming from defendant's drinking, "mad rage" and self-absorption. Indeed, at least one entry reveals that Claire was ready to go it alone if the time came.

Further, in light of the other evidence presented at trial, we cannot say that the trial court's failure to provide defendant access to the diary affected a substantial right of defendant. The sixth assignment of error is not well taken, and is overruled.

*State v. Tolliver, supra,* Exhibit F to Return of Writ.

■ The Court first notes that petitioner did not present any federal constitutional issue to the state court of appeals when he first raised this claim. Rather, he appeared to argue solely a violation of state law. He did not refer to the federal Constitution or cite a single federal case or state case that relied upon federal law in his appellate brief. The only case cited by petitioner referred only to state discovery rules. *See Exhibit C to Return* of Writ, at 45–47. Moreover, petitioner argued only that the trial court "abused its discretion." *Id.,* at 45. Petitioner did argue in reply brief in support of his direct appeal that the prosecutor's failure to provide the diary violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Exhibit E,* at p. 12, *to Return of Writ.* However, he does not appear to raise this same claim before this Court. Therefore, it does not appear that petitioner fairly presented to the state courts the federal constitutional claims presented to this Court by claim seven.

In order to exhaust available state remedies, a petitioner must first fairly present the substance of his federal habeas corpus claims to the state courts. *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982). "The state courts must be provided with a fair opportunity to apply controlling legal principles to the facts bearing upon petitioner's constitutional claims." *Sampson v. Love,* 782 F.2d 53, 55 (6th

Cir.1986). Petitioner does not fairly present his claim simply because the necessary facts supporting a federal constitutional claim are present or because the constitutional claim appears to be self-evident. *Haggins v. Warden,* 715 F.2d 1050, 1054 (6th Cir.1983)(citing *Harless,* 459 U.S. at 6, 103 S.Ct. 276). "A petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions employing Constitutional analysis, or state decisions employing Constitutional analysis in similar fact patterns." *Levine v. Torvik,* 986 F.2d 1506, 1515 (6th Cir.1993)(citing *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir.1987)). Courts normally require more than a single broad generalization that petitioner was denied a "fair trial" or "due process of law." *Franklin,* 811 F.2d at 326; *Petrucelli v. Coombe,* 735 F.2d 684, 688 (2nd Cir.1984). Petitioner, however, need not "cite book and verse on the federal constitution." *Picard,* 404 U.S. at 277, 92 S.Ct. 509 (quoting *Daugharty v. Gladden,* 257 F.2d 750, 758 (9th Cir.1960)). The Sixth Circuit has strictly followed the requirement that petitioner fairly present his federal constitutional claims to the state courts as a precondition to federal habeas review. *Weaver v. Foltz,* 888 F.2d 1097, 1098 (6th Cir.1989). Petitioner therefore has waived the right to present claim seven in federal habeas corpus review.

■ To the extent that petitioner raises a claim regarding the violation of state law, such claim is not appropriate for federal habeas corpus review. A federal court may review state prisoner's habeas petition only on the ground that the challenged confinement is in violation of the Constitution, laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal court may not issue a writ of habeas corpus "on the basis of a perceived error of state law." *Pulley v. Harris,* 465 U.S. 37,

41, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Smith v. Sowders,* 848 F.2d 735, 738 (6th Cir.1988). A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure. *Allen v. Morris,* 845 F.2d 610, 614 (6th Cir.1988). " '[F]ederal courts must defer to a state court's interpretation of its own rules of evidence and procedure' " in considering a habeas petition. *Id.* (quoting *Machin v. Wainwright,* 758 F.2d 1431, 1433 (11th Cir. 1985)). Only where the error resulted in the denial of fundamental fairness will habeas relief be granted. *Cooper v. Sowders,* 837 F.2d 284, 286 (6th Cir.1988). Such are not the circumstances here. Claim seven is therefore without merit.

## VII. CLAIM EIGHT

In claim eight, petitioner asserts that he was denied a fair trial due to the cumulative effect of trial error. The state appellate court rejected this claim as follows:

Defendant argues in his eighth assignment of error that the cumulative effect of the errors in this case denied him a fair trial. "Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprives the defendant of a fair trial." *State v. Fears* (1999), 86 Ohio St.3d 329, 348, 715 N.E.2d 136. Upon review of the entire record, we conclude that defendant received a fair trial. The eighth assignment of error is not well taken, and is overruled.

*State v. Tolliver, supra;* Exhibit F to Return of Writ.

The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief. See *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.2002).

*Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002).

Claim eight is without merit.

## VIII. CLAIM NINE

■ In claim nine, petitioner asserts that he was denied the effective assistance of trial counsel because his attorney failed to procure and present evidence and argument concerning Paxil, Paxil Withdrawal Syndrome, Claire Schneider's medical and psychological history, and the relationship of these matters to her death. *Petition,* at 7. Petitioner contends that such evidence would have supported the defense theory of a "histrionic accident." *Id.*

The state appellate court rejected this claim as follows:

> The Franklin County Grand Jury indicted appellant on murder with a firearm specification, in violation of R.C. 2903.02 and 2941.145, respectively, and tampering with evidence, in violation of R.C. 2921.12. The charges stem from Claire Schneider's death on December 29, 2001.

> On December 29, 2001, appellant talked to law enforcement about Schneider's death, stating "[s]he didn't mean it. * * * She was in the middle of a sentence when she accidentally shot herself. I feel it's my fault, because she didn't know the gun was loaded." (Videotape Tr. 15–16.) Appellant also left a note in Schneider's apartment, stating "[s]he did not know gun was loaded." (Tr. Vol. II, 308.) However, while in jail awaiting trial, appellant told inmate Joseph Adams that he killed Schneider with a nine-millimeter gun.

> A jury trial commenced, and the trial court dismissed the tampering with evidence charge after opening statements. Plaintiff-appellee, the State of Ohio, proceeded with the murder charge and firearm specification.

Columbus Police ballistics expert Mark Hardy and Franklin County Deputy Coroner Dr. Keith Norton testified that Schneider was shot in the mouth from a gun held and fired outside her mouth. Dr. Norton did not determine the motive behind Schneider's death, but did indicate that he has never examined a case that involved a person committing suicide by holding a gun outside the mouth and firing into the mouth.

The state introduced into evidence a white shirt with bloodstains that Schneider's family found in her apartment. The state asserted that appellant wore the shirt when he shot Schneider. Neither law enforcement nor appellant's trial counsel tested the shirt for gunshot residue. Bloodstain expert Robert Young examined the shirt on the state's behalf and testified that "the white shirt was in close proximity to Miss Schneider's face at the instant she was shot." (Tr. Vol. VII, 1069.) On cross-examination, Young indicated that "the white shirt could have been laying on the floor" during the shooting. (Tr. Vol. VII, 1168.)

Appellant's trial counsel called bloodstain expert Stewart James to testify about the white shirt. James opined that nothing in the evidence indicates "whether or not that shirt was being worn at the time the shot was fired." (Tr. Vol. XI, 1645.)

Pharmacist Wendy Arnold and Dr. Stanley McCloy, Jr., testified on the state's behalf. Dr. McCloy testified that he prescribed Paxil for Schneider after diagnosing her with depression. Arnold testified that Schneider filled her last Paxil prescription for 30 tablets on November 24, 2001. According to Arnold, four days would have passed between the day the prescription ran out and December 29, 2001, the day Schneider died. Appellant similarly told law en-

forcement that Schneider "had not taken her medication." (Videotape Tr., 16.) McCloy stated that "[i]n less than a minority of cases," a patient failing to take prescribed Paxil medication for a few days "could experience a bit of withdrawal." (Tr. Vol. VIII, 1126.)

During the trial, the state referred to a coat that law enforcement found on Schneider. The state asserted that Schneider wore the coat while attempting to flee from appellant. Neither law enforcement nor appellant's trial counsel tested the coat for gunshot residue.

Appellant's trial counsel contended throughout the trial that Schneider accidentally shot herself. During closing argument, defense counsel emphasized that Schneider did not know that the firearm was loaded and that she shot herself during the middle of her sentence.

After deliberations, the jury found appellant guilty of murder and the firearm specification. The trial court sentenced appellant to consecutive prison terms of three years on the firearm specification and 15 years to life on the murder conviction.

Appellant appealed his conviction, which we affirmed in *State v. Tolliver*, Franklin App. No. 02AP–811, 2004 WL 625683, 2004–Ohio–1603. The Ohio Supreme Court declined review in *State v. Tolliver*, 103 Ohio St.3d 1407, 812 N.E.2d 1289, 2004–Ohio–3980.

Meanwhile, appellant filed before the trial court a petition for post-conviction relief and requested an evidentiary hearing on the matter.... Appellant ... asserted that his trial counsel's performance constituted ineffective assistance because trial counsel failed to: ... (2) elicit evidence from Schneider's family regarding Schneider's emotional state before her death, and (3) assert a defense that Schneider committed suicide due to her suffering "Paxil withdrawal syndrome." (Appellant's brief, 2.) In making these claims, appellant asked the trial court to ... to fund a psychiatrist to aid his "Paxil withdrawal syndrome" defense.

In support of the "Paxil withdrawal syndrome" claim, appellant submitted documents that reference patients becoming suicidal after discontinuing Paxil or related medications. Appellant also provided copies of sworn testimony that Drs. Healy, Shipko and Glenmullen gave in a civil products liability suit against Paxil, that challenged Paxil advertisements and warning labels. Dr. Healy stated that ten percent of Paxil users have severe withdrawal symptoms that "can" or "may" lead to suicide. (R. 370, Dr. Healy testimony, ¶¶ 16, 24.) Dr. Shipko described symptoms of Paxil withdrawal, but did not mention suicide. Dr. Glenmullen said that "[s]ome patients in acute withdrawal have impulsive, aggressive, or suicidal urges." (R. 370, Dr. Glenmullen testimony, ¶ 24.)

Appellant also submitted correspondence from Drs. Healy and Shipko. Appellant asked the doctors to comment on whether Schneider committed suicide because of Paxil withdrawal. Dr. Healy indicated that "[t]he brief outline of your case makes it look stronger than many others in this area. However, I am particularly bogged down just at the moment." (R. 371, Dr. Healy correspondence.) Dr. Healy then referred appellant to another expert. Dr. Shipko stated, "[b]ased on the information available it seems that there is ample information to suggest that Paxil was the problem * * *. Usually I review all of the available records before I indicate whether or not I would be willing to

render an opinion." (R. 371, Dr. Shipko correspondence.)

Furthermore, appellant presented a premarketing study on Paxil and related medications. The study indicates that there is "no signal * * * that [Paxil and related medications] exposes [sic] a subset of depressed patients to additional risk for suicide." (R. 370, Review and Evaluation of Clinical Data, 25.)

The trial court denied the post-conviction petition without an evidentiary hearing.... The trial court ... concluded that appellant presented insufficient documentation to support his claim that trial counsel was ineffective by failing to present the "Paxil withdrawal syndrome" defense.

Appellant contends that he set forth sufficient operative facts to support his ineffective assistance of counsel claims, thereby warranting an evidentiary hearing. We disagree.

The United States Supreme Court established a two-prong test for ineffective assistance of counsel. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, the defendant must show that counsel's performance was outside the range of professionally competent assistance and, therefore, deficient. Id. at 687, 104 S.Ct. 2052. Second, the defendant must show that counsel's deficient performance prejudiced the defense and deprived the defendant of a fair trial. Id. Moreover, a defendant must overcome a strong presumption that the challenged action constitutes trial strategy. *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965.

In his post-conviction petition, appellant contended that his trial counsel was ineffective by failing to claim that Schneider committed suicide from "Paxil withdrawal syndrome." In raising this conten-

tion, appellant requested that the trial court fund a psychiatrist for assistance. However, neither the post-conviction statute nor the constitution warrants funding for such expert assistance in a post-conviction petition. See *State v. Hooks* (Oct. 30, 1998), Montgomery App. No. CA 16978, 1998 WL 754574; *State v. Smith* (Mar. 15, 2000), Lorain App. No. 98CA007169, 2000 WL 277912. Moreover, appellant is not entitled to discovery to help him establish substantive grounds for relief during the initial stage of a post-conviction proceeding. See *State v. Gulertekin* (June 8, 2000), Franklin App. No. 99AP–900, 2000 WL 739431; *State v. Samatar*, Franklin App. No. 03AP–1057, 2004 WL 1157475, 2004–Ohio–2641, at ¶ 21. Thus, appellant's request for expert assistance does not overcome his burden to provide sufficient operative facts demonstrating substantive grounds for relief, as required in R.C. 2953.21(C).

Likewise, appellant presented no medical expert opinion or analysis specifically linking Schneider's death to suicide triggered by "Paxil withdrawal syndrome." Such evidence is necessary because "whether, and to what extent, Paxil causes discontinuation symptoms varies from patient to patient." *In re Paxil Litigation* (C.D.Cal., 2003), 212 F.R.D. 539, 551.

Testimony from Drs. Healy, Shipko and Glenmullen do not link Schneider's death to suicide from Paxil withdrawal. Although the doctors discuss "Paxil withdrawal syndrome," their testimony pertains to a civil products liability case, not a murder trial. Moreover, the doctors did not quantify the instances that Paxil withdrawal actually leads to suicide. Indeed, Dr. Shipko did not even mention suicide as a withdrawal symptom, and Dr. Healy stated that severe

withdrawal "can" or "may" lead to suicidal tendencies. (R. 370, Dr. Healy testimony, ¶¶ 16, 24.)

Nor do the correspondences from Drs. Healy and Shipko link Schneider's death to suicide from "Paxil withdrawal syndrome." Dr. Healy made no definitive conclusion about Schneider's death because he was "particularly bogged down just at the moment." (R. 371, Dr. Healy correspondence.) Similarly, Dr. Shipko was unwilling to opine about Schneider's death because he first wanted to "review all of the available records." (R. 371, Dr. Shipko correspondence.) In addition, the experts' tentative statements are unreliable because appellant only provided them with information that assumed Schneider killed herself, with no mention of evidence suggesting murder.

Moreover, appellant presented documentation that actually refutes his "Paxil withdrawal syndrome" claim. The pre-marketing study indicates "no signal" suggesting that "[Paxil and related medications] exposes [sic] a subset of depressed patients to additional risk for suicide." (R. 370, Review and Evaluation of Clinical Data, 25.)

Lastly, the evidence from trial contradicts appellant's claim that Schneider committed suicide. Appellant told law enforcement, "[s]he didn't mean it. * * * She was in the middle of a sentence when she accidentally shot herself. I feel it's my fault, because she didn't know the gun was loaded." (Videotape Tr. 15–16.) Similarly, appellant left a note in Schneider's apartment, stating "[s]he did not know gun was loaded." (Tr. Vol. II, 308.) In addition, Dr. Norton suggested that he has never examined a case that involved someone committing suicide by firing a gun from outside the mouth into the mouth. Furthermore, appellant eventually confessed to inmate Adams that he killed Schneider.

Therefore, the trial court record, postconviction petition and supporting documents do not establish that Schneider committed suicide from "Paxil withdrawal syndrome." Thus, appellant failed to set forth sufficient operative facts to support his claim that trial counsel provided ineffective assistance by not presenting the "Paxil withdrawal syndrome" defense.

* * *

Lastly, appellant contended that trial counsel was ineffective by failing to elicit evidence from Schneider's family regarding her emotional state before her death. However, trial counsel made a sound strategic decision not to elicit information from Schneider's family given the likelihood that they would be hostile to appellant's defense. *See Carter*, at 558, 651 N.E.2d 965. Furthermore, appellant provided no documentation to verify what Schneider's family actually recalls about Schneider's emotional state, and instead relies on insufficient conclusory allegations. *See Jackson*, at 111, 413 N.E.2d 819; *Walker*, at ¶ 8.

Accordingly, appellant has failed to provide specific operative facts demonstrating substantive grounds for relief to support his ineffective assistance of counsel claims. Thus, pursuant to R.C. 2953.21(C), the trial court did not abuse its discretion by denying the claims without an evidentiary hearing.

*State v. Tolliver*, 2005 WL 534897 (Ohio App. 10 Dist. March 8, 2005), Exhibit R to Return of Writ. Again, the factual findings and decision of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(d), (e). The record fails to reflect that federal habeas corpus relief is warranted. *See Williams v. Taylor, supra.*

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac,* 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana,* supra, 350 U.S., at 101, 76 S.Ct., at 164.

\* \* \*

... [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

... [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]

*Strickland v. Washington, supra,* 466 U.S. at 690–91, 104 S.Ct. 2052. For the reasons detailed by the state appellate court, this Court likewise concludes that petitioner has failed to establish the ineffective assistance of counsel under the test set forth in *Strickland.*

Claim nine is without merit.

## IX.

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

If any party objects to this *Report and Recommendation,* that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

November 20, 2007.